JOSEPH P. HORNING, JR. AND LAWRENCE E.
HORNING T/A Horning Brothers
*v.* ALBERT R. HARDY ET AL.

[No. 818, September Term, 1976.]

*Decided June 10, 1977.*

The cause was argued before MORTON, DAVIDSON and LISS, JJ.

*Bernard F. Goldberg*, with whom was *Howard Silverstein* on the brief, for appellants/cross-appellees.

*E. Alexander Adams*, with whom were *Cornelius F. Sybert, Jr.*, and *Sybert, Sybert & Nippard* on the brief, for cross-appellants/appellees.

*Robert E. Wieder* for appellees Martins.

LISS, J., delivered the opinion of the Court.

To unravel its complexities, this case on its face would seem to require the services of a "Philadelphia lawyer," [1] but when the parties and issues of the several appeals have been sorted out, we find there are but two basic issues to be decided.

The first issue concerns the ownership of a parcel of land consisting of all or part of five lots shown on a plat of a subdivision known as Timberleigh Village in Howard County. The original suit in this case, filed by Albert C. Hardy [2] (appellee and cross-appellant herein), consisted of a two count declaration alleging that William B. Martin and

---

1. "Many historians credit Andrew Hamilton with being the one who, through his successful defense of John Peter Zenger, not only established in the New World the freedom of the press but also created the appellation you here have enjoyed of being 'Philadelphia Lawyers.' " Lloyd Wright, *The President's Annual Address: Milestones and Concepts of the Lawyer Citizen*, 41 A.B.A.J. 797 (1955).

2. Additional members of the Hardy family were joined as party plaintiffs pursuant to Maryland Rules of Procedure 320 B 1.

his wife, Phyllis (cross-appellees herein), and Joseph P. Horning, Jr. and Lawrence E. Horning, partners, trading as Horning Brothers (appellants and cross-appellees herein), had committed trespass *quare clausum fregit* on land owned by the Hardys and sought damages from the Hornings and their ejectment from the property allegedly owned by the Hardys.

The cross-appellees, Hornings, filed a cross claim against the Martins, from whom they had purchased the lots in question, seeking damages based on the special warranty recited in their deed. In addition, they filed an amended counter-claim against the Hardys in which they sought compensatory and punitive damages for malicious interference with the contracts between the Hornings and various purchasers of homes erected by the Hornings on the disputed lots, as well as damages for slander of title.

After a number of preliminary rulings which are not here in dispute, the case came on for trial in the Circuit Court for Howard County before Judge James Macgill sitting without a jury.

In the trial below, the Hardys claimed ownership of the disputed land by virtue of their title deeds and by reason of adverse possession for the required 20 year period. In their appeal briefs and in argument they sought to have this Court accept — if necessary to their cause — the additional alternative that their title was established by a doctrine novel to Maryland law known as the doctrine of boundary by acquiescence. Counsel for the Hardys have submitted a thorough discussion of the law governing this doctrine in other jurisdictions, but we shall not consider this ground in this appeal. Whether the doctrine of boundary by acquiescence should or should not be adopted in Maryland will have to await a case in which the issue is raised and decided in the trial court. In this case, the appellees/cross-appellants failed to present and preserve this issue in the court below, and it will not be decided for the first time on appeal. Rule 1085.

Judge Macgill, who presided at the five day trial in this matter, personally viewed the property in question, walked

the boundary lines as surveyed, and prepared a detailed opinion showing the title history of the general area and specifically the area in dispute. We must commend the trial court for a remarkably thorough and expert analysis of the ownership of the lots claimed by the contesting parties in this suit. We are mindful of the strictures of Rule 1086 which require us to review a non-jury case on the law and the evidence but preclude our setting aside the judgment of the lower court on the evidence unless that judgment is clearly erroneous. We do not find such error in the court's conclusion as to the ownership of the lots in question and shall adopt the trial court's excellent opinion as to that issue, adding such additional authorities as we deem appropriate:

> "The Hardys claim ownership of the land in dispute by virtue of their title deeds and also by virtue of adverse possession for the statutory period. It appears to be agreed that whether or not the disputed area lies within the area covered by their title deeds depends upon the correct location of the seventh line of a tract of land called 'Peace.' (There is a certain irony in the name under the present circumstances). This tract evidently is an early grant, dating from the eighteenth century. It was not offered in evidence. The writer, in attempting to arrive at a conclusion as to where the title lines of the respective parties lie, has prepared a plat which shows the locations, or approximate locations of the various deed lines as it has plotted them. A copy of this plat is attached to this opinion and should be considered a part of it."

Judge Macgill thereupon proceeded to an exhaustive and comprehensive fact finding discussion of the metes and bounds of the property involved in the dispute. It would serve no useful purpose to repeat that discussion in this opinion.

The trial court then gave its reasons for its conclusion that the appellees had not met their burden of proof:

> "This Court finds that the plaintiffs have not

established, by a preponderence of the evidence, that the disputed area lies within the lines of their title deeds. It believes, on the contrary, that the area in dispute lies on the easterly side of the seventh line of 'Peace' and is within the title lines of the defendants. This conclusion is not arrived at with a conviction of certainty, there is much that does not appear to be reconcilable in the various deed descriptions but in actions of both trespass and ejectment, the plaintiffs must recover on the strength of their own title and not by the weakness of the title of the defendants. *Ferittta v. Bay Shore Development Corporation,* 252 Md. 393, [250 A. 2d 69 (1969)]; *Janoske v. Friend,* 261 Md. 358, [275 A. 2d 474 (1970)]; *Giles v. diRobbio,* 186 Md. 258, [46 A. 2d 611 (1946)]; *Stottlemyer v. Kline,* 255 Md. 635, [259 A. 2d 52 (1969)].

"As to the plaintiffs' claim of title by adverse possession to the wooded area in question, there was testimony that they had cut firewood and timber and dumped stones easterly of the boundary line claimed by the defendant for a period in excess of twenty years. There was also testimony as to the location of old barbed wire fences but the significance of these locations is, at best, ambiguous. Cf. *Stinchcomb v. Realty Mortgage Co.,* 171 Md. 317, [188 A. 2d 790 (1937)]. It has been said that in order to establish adverse possession of unenclosed timberland, evidence of the cutting and hauling of timber therefrom is not of itself sufficient, because such acts might be nothing more than successive trespasses. *Malone v. Long,* 128 Md. 377, [97 A. 643 (1916); *Schlueter v. Ackerman,* 215 Md. 173, 137 A. 2d 179 (1957)]. The same is true as to evidence of digging and selling sand. *Parker v. Wallis,* 60 Md. 15 [(1883)]. It was there said that 'To work an ouster, the acts must be such as indicate to the world a claim of right to the land — acts of exclusive and continuous posses-

sion, open and notorious ...' [*Id* at 19]. In *Goen v. Sansbury,* 219 Md. 289 [297, 149 A. 2d 17, 22 (1959); the law was quoted that 'the holder of the older and better title has constructive possession of all of his land; and the holder of the junior and inferior title that overlaps it must, if he is to acquire good title, enter upon and actually hold adversely and continuously for the requisite period the actual boundary claimed by the older and better title ....' '[O]ne who enters upon the land of another, though under color of title, gives no notice to that other of any claim, *except to the extent of his actual occupancy.'* [*Id* at 294, 149 A. 2d at 20]. (underscoring supplied). Furthermore, a mere statement of ownership, absent actual physical possession, is inadequate to constitute adverse possession. *White v. Hardisty,* 220 Md. 152, [151 A. 2d 764 (1959)].

"This Court having found that the plaintiffs are not entitled to prevail in their actions, it follows that the cross-claimants, Joseph P. Horning, Jr. and Lawrence E. Horning are not entitled to prevail against the defendants, William B. Martin and Phyllis B. Martin."

The second issue to be determined in this appeal is whether the trial court erred in entering its judgment in favor of the appellees (Hardys) on the amended counter claim of the appellants (Hornings). We find no error and shall affirm.

The Hornings' amended counter claim contended that they were entitled to damages from the Hardys because of an alleged slander of the Hornings' title to the land in dispute and because of an alleged malicious interference with contracts between the Hornings and purchasers of buildings constructed by the former on that land. The parties and the trial court treated the two claims as one — at the trial, in the briefs, and on argument — because legally and factually the absence of malice, if established, would be dispositive of

both claims. In this Court the parties have primarily concerned themselves with the issue of slander of title.

As previously indicated in this opinion, the Hardings purchased the property here involved from the Martins in August of 1973. Later that month Albert R. Hardy, one of the appellees, communicated with an agent of the Hornings and advised him that the Hardys claimed ownership to a portion of the land purchased from the Martins. The Hornings immediately employed a surveying firm which after studying the property boundaries reported that the disputed land was owned by the Martins at the time of conveyance to the Hornings. In September, 1973 counsel for the Hardys notified the Martins and Hornings that "further development of the disputed parcel of land will be done at your own risk." From that date until October 9, 1974, when the Hardys filed suit, there was no further communication between the parties. In the interim, the Hardys had employed a surveying firm which reported that four of the five houses being constructed by the Hornings were on land owned by the Hardys. Settlement for one of the houses built on a lot in the disputed area was scheduled for October 10, 1974. On the day of settlement, while the adjustments were being calculated, the lending institution and purchasers received a phone call from the Hardys' attorney advising them that a suit claiming ownership of the disputed land had been filed the preceding day. Settlement was immediately aborted, and no sales or settlements have been consummated since that date for any of the houses erected on the land claimed by the Hardys. The Hornings contend that the Hardys' claim was false and amounted to a slander of their title to the disputed land.

Prosser, *Law of Torts*, § 128 (4th Ed., 1971) suggests that the tort we are here discussing has been incorrectly designated as "slander of title." Such nomenclature derives from the earliest cases — decided before 1600 — where it applied primarily to oral aspersions on the plaintiff's ownership of land, which aspersions prevented the owner from leasing or selling the land. Prosser points out that from the beginning the tort was recognized as being only loosely

allied to defamation of the person and was considered instead to be an action on the case for the special damage resulting from the defendant's interference. As the years progressed, the tort was expanded to include written aspersions on property, whether land or personalty, and the disparagement of the quality of property. The tort has, therefore, been known as "disparagement of property," "slander of goods," and "trade libel." It has continued to grow until now it includes interference with non-commercial relations, such as the expectancy of a marriage, the right to remain in the United States rather than be deported, or the false reporting of payments to an employee by an employer which subjects him to an income tax prosecution. Prosser contends that the best and most inclusive name for the tort is "injurious falsehood," first suggested by Sir John Salmond in his treatise on the law of torts.

The Court of Appeals has had before it only two cases involving "slander of title." In the interest of clarity we believe it appropriate to adopt the nomenclature suggested by Prosser and that this controversy — as well as those which may hereafter fall within the guidelines which we have stated — should be considered as the tort of "injurious falsehood."

The first case involving an action of this kind was reached by the Court of Appeals in 1865 in *Gent v. Lynch*, 23 Md. 58. The Court, without discussing the elements of the tort, held that in order to recover the plaintiff must show malice, which it did not define.

A much more valuable contribution to the clarification of the tort in Maryland was made by Judge Wilson K. Barnes in the case of *Beane v. McMullen*, 265 Md. 585, 291 A. 2d 37 (1972). Quoting extensively from Prosser, Judge Barnes said:

> "Injurious falsehood or disparagement, then, may consist of the publication of matter derogatory to the plaintiff's title to his property, or its quality, or to his business in general, or even to some element of his personal affairs, of a kind calculated to prevent others from dealing with him, or

otherwise to interfere with his relations with others to his disadvantage. The cause of action founded upon it resembles that for defamation, but differs from it materially in the greater burden of proof resting on the plaintiff, and the necessity for special damage in all cases. The falsehood must be communicated to a third person, since the tort consists of interference with the relation with such persons. But the plaintiff must plead and prove not only the publication and its disparaging innuendo, as in defamation, but something more. There is no presumption, as in the case of personal slander, that the disparaging statement is false, and the plaintiff must establish its falsity as a part of his cause of action. Although it has been contended that there is no essential reason against liability where even the truth is published for the purpose of doing harm, the policy of the courts has been to encourage the publication of the truth, regardless of motive.

"In addition, the plaintiff must prove in all cases that the publication has played a material and substantial part in inducing others not to deal with him, and that as a result he had suffered special damage. The analogy is thus to the kind of personal slander which does not charge a crime or loathsome disease, or defame him in his business, profession, or office, and so is not actionable unless damage is proved.

. . .

"There is liability when the defendant acts for a spite motive, and out of a desire to do harm for its own sake; and equally so when he acts for the purpose of doing harm to the interests of the plaintiff in a manner in which he is not privileged so to interfere. There is also liability when the defendant knows that what he says is false, regardless of whether he has an ill motive or

intends to affect the plaintiff at all. The deliberate liar must take the risk that his statement will prove to be economically damaging to others; and there is something like the 'scienter' found in an action of deceit. Any of these three is sufficient to constitute 'malice' and support the action. But in the absence of any of the three there is no liability, where the defendant has made his utterance in good faith, even though he may have been negligent in failing to ascertain the facts before he made it." [3] *Id.* at 607-09.

The law of defamation has been in a state of flux in the Supreme Court of the United States since 1964, when the decision in *N.Y. Times v. Sullivan,* 376 U. S. 254, 84 S. Ct. 710, 11 L.Ed.2d 686, 95 A.L.R. 2d 1412 (1964) was filed. *Gertz v. Welch,* 418 U. S. 323, 94 S. Ct. 2997, 41 L.Ed.2d 789 (1974) held that in a purely private defamation action the States were free to adopt their own standard of liability for the defamation defendant but could not impose liability without fault.

The Court of Appeals, speaking through Judge Levine in *Jacron Sales Co., Inc. v. Sindorf,* 276 Md. 580, 350 A. 2d 688 (1975), stated that in cases of purely private defamation it would adopt as a matter of state law the standard of negligence as set forth in *Restatement (Second) of Torts,* § 580B (Tentative Draft #21, 1975), which states that liability may accrue only if the defendant a) knows that the statement is false and that it defames the other, b) the defendant acts in reckless disregard of these matters, or c) acts negligently in failing to ascertain them. The opinion further held that the quantum of proof required of the plaintiff was the usual negligence standard of the preponderance of the evidence.

In the case here being considered, there is one further

---

**3.** *See* 50 Am. Jur. 2d *Libel and Slander* §§ 539-51, at 1058-69; 53 C.J.S. *Libel and Slander* §§ 269-79, at 391-404; 1 Harper and James, *The Law of Torts* §§ 6.1-6.3 at 474-86 (1956); 3 Restatement, *Torts* §§ 624-25, at 325-32, § 629 at 338-42 (1938).

complicating factor: the assertion of a qualified privilege by the appellees. Prosser, *supra,* at pp. 944-45 states the privilege to be as follows:

> "If [the defendant] has a present, existing economic interest to protect, such as the ownership or condition of property ... he is privileged to prevent performance of the contract of another which threatens it; and for obvious reasons of policy he is likewise privileged to assert an honest claim, or bring or threaten a suit in good faith, to exercise the right of petition to public authorities or to settle his own case out of court."

Further justification for the recognition of the conditional privilege is stated in 1 Harper and James, *The Law of Torts,* § 6.2 (1956):

> "If, knowing that another is offering or about to offer land or other thing for sale as his own, he fails to take advantage of a readily available opportunity to inform the intending purchaser, or those likely to become purchasers, as where the sale is by auction, of his claim to the thing, he may preclude himself from afterwards asserting it against the purchaser. Therefore, he must be permitted without fear of liability to protect the enforceability of his claim by asserting it before the purchase is made."

*Jacron, supra,* makes it clear that the adoption of the negligence standard of fault in defamation cases does not make obsolete the defense of conditional privilege. In a case where a common law conditional privilege is asserted and found as a matter of law to exist, "the negligence standard of *Gertz* is logically subsumed in the higher standard for proving malice, reckless disregard as to truth or falsity . . . ." *Id.* at 600, 350 A. 2d at 700. If the plaintiff, faced with a conditional privilege, is unable to prove the malice necessary to overcome that defense, the proof of the lesser standard of negligence would not permit a recovery. *See Stevenson v. Baltimore Club,* 250 Md. 482, 243 A. 2d 533

(1968). In conditional privilege cases, the privilege may be lost either by proof of "constitutional malice" in the form of reckless disregard for truth or falsity or knowing falsehood or by proof of common law malice in the form of spite or ill-will.

The question of whether a conditional privilege exists is a matter of law for the court. Whether the privilege has been abused or forfeited by malice is a question of fact for the trier of the facts. *IBEW, Local 1805, AFL-CIO v. Mayo,* 35 Md. App. 169, 370 A. 2d 130 (1977). The trial court found as a matter of law that the interference by Hardy with the Hornings' title was privileged. It concluded that the "original plaintiffs asserted an honest claim to the land in question which they had reason to believe was part of their property and they therefore had a present economic interest to protect." We hold this conclusion to be correct, particularly when it is obvious that after the long and involved trial in this case the appellees failed to prevail, not because the Hornings were able to establish conclusively their title but, because the appellees were unable to meet their burden of proof to the satisfaction of the trier of the facts.

There is absolutely no evidence that the appellees acted with knowledge of the falsity of their claim or that they were motivated by ill-will or spite. In the case of *Kapiloff v. Dunn,* 27 Md. App. 514, 540, 343 A. 2d 251, 268 (1975), Chief Judge Orth (now an associate judge of the Court of Appeals) discussed the standards to be applied in determining whether a court could find a reckless disregard of the truth or falsity of a statement. Quoting from *St. Amant v. Thompson,* 390 U. S. 727, 88 S. Ct. 1323, 20 L.Ed.2d 262 (1968), Judge Orth said:

> "These cases are clear that reckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication."

Appellants urge strenuously that the failure of the appellees to act in good faith to verify the boundaries of the land which they claimed and in their failure to secure expert opinion as to the validity of their claim is evidence of a reckless disregard for the truth. This contention ignores, however, our holding in *Kapiloff, supra,* where we said:

"Although the test for reckless disregard does not avail itself of easy application, one point is clear: mere failure to investigate, in and of itself, is not sufficient evidence under the *New York Times* privilege. . . . Since failure to investigate cannot satisfy the constitutional test of reckless disregard, we cannot perceive how mere failure to seek assistance of educational experts, without more, could satisfy that standard." *Id.* at 543, 343 A. 2d at 269.

The trial court found as a fact that there was no abuse of the conditional privilege and we find no plain error in its conclusions. Rule 1086 requires that in a case tried below without a jury that we not set aside a judgment of the lower court on the evidence unless we find the trial court clearly erroneous. We are also required to give due regard to the opportunity of the trial court to judge the credibility of the witnesses. Applying these standards, we find no reversible error.

*Judgments affirmed.*
*Costs to be divided between*
*Hornings and Hardys.*