WILLIAM E. DIXON AND ERNEST J. LITTY,
IND. AND CO-PARTNERS T/A BENEDICT
ASSOCIATES ET AL. *v.* THE
PROCESS CORPORATION

[No. 1273, September Term, 1979.]

*Decided July 10, 1980.*

The cause was argued before GILBERT, C. J., and LISS and WEANT, JJ.

*Timothy E. Meredith,* with whom were *William L. Corbin* and *Corbin, Heller & Warfield, Chartered* on the brief, for appellants.

*Bayard Z. Hochberg* for appellee.

LISS, J., delivered the opinion of the Court.

"The scenario from which this appeal arises is intricate, ofttimes confusing and, yet, probably typical of many present-day land transactions." So said Chief Judge Gilbert in an earlier appeal to this Court which involved the same parties.[1] Unfortunately, in the interim since the parties last appeared before us, the situation has become even more confusing.

The appellee in the present case, The Process Corporation (TPC), was incorporated in April of 1972 for the purpose of engaging in land development. TPC was one of a number of independent subsidiaries of the parent corporation known as Process Incorporated of Maryland (PIM). Thomas A. Garland was the president of the various corporations and chairman of the board of PIM.

In the early part of 1972, a law partner of Garland's, John Healey, contacted appellant William E. Dixon to solicit Dixon's investment in a proposed development known as Clinton Woods which was located in Prince George's County. Dixon declined to invest in the Clinton Woods project. Later that same year, Healey again communicated with Dixon and informed him that the development and acquisition of a

---

1. Dixon v. Process Corp., 38 Md. App. 644, 646, 382 A.2d 893 (1978).

large tract of land consisting of five farms located in Charles County, called Maxwell Hall, was pending, but that $150,000 was needed by the end of 1972 to purchase one of the farms known as the Chaney farm. Dixon expressed interest in the project and contacted appellant Ernest J. Litty who agreed to finance the venture. Dixon and Litty formed a partnership known as Benedict Associates. The transaction which would allow the Process organization to settle on the Chaney farm involved Dixon providing the settlement funds and Garland taking the title to the land in his name as trustee for Dixon. The arrangement was for Garland to hold the property for approximately one year and then have PIM repurchase the property at a profit to Dixon.

The settlement on the Chaney tract was consummated on December 27, 1972. PIM issued two confessed judgment notes in favor of the appellants for $35,000 and $25,000, which Garland signed in his capacity as president of PIM. On December 14, 1973, PIM exercised its option to purchase the Chaney tract; however, the repurchase was not consummated at that point because PIM did not have sufficient funds to do so. In consideration of a ninety day extension of the date of settlement, Garland executed a promissory note for $50,000 payable to Dixon and Litty. The repurchase never occurred, no payments were ever made by Process on the notes, and confessed judgments were obtained in the Circuit Court for Charles County against PIM by the appellants according to the terms of each note on July 23, 1974.

In August of 1974, Monumental Title Company sought to obtain exclusive rights to handle settlements for the Ryland Corporation in the State of Maryland. Monumental was largely owned and controlled by Dixon who was the chairman of the board of that company. Ryland is a home building company whose method of operation includes entering into an option agreement with the developer of a subdivision, and selling its homes by displaying models. Once a home buyer signs a contract with Ryland, Ryland then exercises its option on the specific lot needed for building. The method contemplates one settlement when

Ryland pays the developer and then a second settlement
with the home buyer. Ryland was a purchaser of lots from
TPC in the Clinton Woods development, and had scheduled
the settlement of eight lots in that tract for January of 1975.

Prior to the scheduled settlement date for the Ryland
homes, Dixon realized that there were two "Process"
corporations, and the property in Clinton Woods was held by
the wholly owned subsidiary, TPC, rather than the parent
corporation, PIM, against which Benedict Associates had
judgments. Dixon, at the time of the settlement instructed
Monument's settlement officer to put the settlement through
on the Ryland lots, but to withhold any proceeds due TPC.
The settlement sheet submitted to Garland on the day of
settlement, unlike the one originally sent to Garland,
indicated that the sum of $3,906.18 was to be paid to William
E. Dixon on account of the judgments against PIM, and TPC
was to be paid nothing. Garland then refused to proceed with
the settlement. Garland testified that he "told Dixon that he
knew full well he [Dixon] wasn't entitled to any money. He
[Dixon] said he was claiming it because of his judgments
against PIM. . . ." Consistent with Garland's testimony was
that of Dixon:

> I went in and talked with Mr. Garland. I told him
> my position. I told him that I, where I stood, that —
> that before I took that position, and on a firm
> position, I called Charlie Atwater [an attorney] to
> determine if my thinking was proper and correct. If
> they could be declared by a court. And he disagreed
> vehemently. And I suggested, alright, we'd put —
> we'd put the settlement through, let's not hold up
> the settlement. And we'll put the proceeds in
> escrow, and let's file a bill of either declaratory
> decree or a quiet title to determine whether or not
> my position is right or wrong. Mr. Garland said,
> absolutely not, nobody was going to hold his
> proceeds. He took the deed and left.

Shortly after the aborted settlement, Dixon contacted a
former employee of his at Monumental who he felt Garland

would ask to handle the settlement. Dixon put his former employee on notice of his intention to file suit to enforce the judgments which Dixon held against PIM. Dixon also called Healey to apprise him of his intention to litigate the dispute. The result was that neither Dixon's former employee nor Healey would insure title to the lots. Garland then secured title insurance through another company and the settlement was completed on January 10, 1975, with $3,906.18 being paid to TPC.

TPC continued to sell lots in Clinton Woods to Ryland. However, TPC encountered financial difficulties and eventually surrendered the last thirty-two lots in Clinton Woods to the Union Trust Company in 1977 in order to avoid any further liability.

On October 23, 1975, the appellants filed an unsuccessful suit in equity in Prince George's County against PIM and TPC in an attempt to have the court declare the assets of TPC to be those of PIM and thus to declare their judgments against PIM to be liens against Clinton Woods. In that earlier case, the appellants also claimed fraud sufficient to pierce the corporate veil of PIM and TPC. The lower court in that case found insufficient evidence of fraud, and this Court upheld that ruling on appeal although "there was legally sufficient evidence to cast doubt as to the separate corporate identities of PIM and TPC. . . ." *Dixon v. Process Corp., supra,* at 654. The legal fees for defending the Prince George's County suit are claimed as an element of compensatory damages in the present action.

TPC filed the present suit at law in August of 1975 in the Circuit Court for Anne Arundel County against appellants, William E. Dixon and Ernest J. Litty, individually, and trading as Benedict Associates, and Monumental Title Company, seeking compensatory and punitive damages for slander of title and interference with contractual relations.[2]

2. We glean from the record a course of conduct on the part of Dixon which included numerous instances of interference with the contractual relations of the parties here involved. In addition to his threat of litigation directed at Healy and his warning to his former employee at Monumental of his intention to enforce the judgment against PIM, Dixon also called the owner of Calvert Land Title Company, a competitor of Monumental, and

At trial, appellants defended by claiming a conditional privilege. The lower court found that the appellants acted without any conditional privilege, and judgment was entered against the appellants, jointly and severally. The appellee was awarded $18,600 in compensatory damages and $21,000 in punitive damages. It is from this judgment that the present appeal has been filed.

The issues to be decided as raised by the appellants are:

I. Whether there was a conditional privilege to make statements regarding one's own legal rights to parties who might conceivably be affected by those legal propositions?

II. Whether the trial court erred in awarding punitive damages?

III. Whether the trial court erred in permitting the plaintiff to recover attorney's fees which were incurred in prior litigation with the defendants?

I.

Appellants urge that they had available to them the defense of a conditional privilege in this suit for injurious falsehood amounting to a defamation of appellee's title to the land here involved. The *Restatement (Second) of Torts* Sec. 594 (1977) deals with the conditional privilege to make statements in the furtherance of one's own self interest:

> An occasion makes a publication conditionally privileged if the circumstances induce a correct or reasonable belief that

---

advised him that if he put the Ryland settlement through, he "would have all kinds of trouble." Dixon also contacted the manager of Ryland's Washington division to inform him that the owner of Calvert Title didn't know what he was doing and if settlement were to be had the title wouldn't be any good. Further, Dixon told an officer of Union Trust, then involved in the refinancing of Clinton Woods, that PIM and TPC "were in reality one entity and that ... his allegations were of a serious nature that would in fact cloud title...." And in February, 1975, Dixon communicated with counsel for Union assisting in the refinancing of Clinton Woods that "in fact the corporate entities were one and the same and that the lien of any judgment obtained against PIM extended also ... against TPC...."

(a) there is information that affects a sufficiently important interest of the publisher, and

(b) the recipient's knowledge of the defamatory matter will be of service in the lawful protection of the interest.

Comment *c* of Sec. 594 emphasizes that the privilege depends on whether the publisher believes an interest of his is affected even if that belief is erroneous as a matter of fact:

> If there is information which affects a sufficiently important interest, as stated in Clause (a) and if the publication is made to a proper recipient, as stated in Clause (b), the privilege applies. If the interest is not in fact affected or if the recipient of the publication is not a proper person to receive the information, the privilege nevertheless applies if the publisher reasonably believes that this is the case.

To the same effect is Comment *h* which states:

> For the conditional privilege to arise under the rule stated in this Section [594], it is not necessary that the publisher's interest be actually in danger. It is enough that the circumstances are such as to lead a reasonable man to believe that the interest is in danger and that the defamatory publication is reasonably necessary for its protection.

With respect to slander of title referred to as "injurious falsehood," there is stated in Sec. 647 of the *Restatement (Second)* a special conditional privilege analogous to the defamation privilege encompassed by Sec. 594. This privilege is defined as follows:

> A rival claimant is conditionally privileged to disparage another's property in land, chattels or intangible things by an assertion of an inconsistent legally protected interest in himself.

Comment *b* of Sec. 647 explains:

This Section states an added conditional privilege, applicable only to the publication of injurious falsehood and not to defamation. It differs from the conditional privilege stated in Sec. 594 in that it goes further and permits the publisher to assert a claim to a legally protected interest of his own provided that the assertion is honest and in good faith, even though his belief is neither correct nor reasonable.

Comment *d* of Sec. 647 points out it is only necessary that there be some chance of the asserted claim being sustained. That Comment states:

One may disparage another's property in land, chattels or intangible things by asserting a legally protected interest in one's self that is inconsistent with the other's property in the land or other things in question. Under the rule stated in this Section a rival claimant is privileged to assert the inconsistent interest unless a trier of fact is persuaded that he did not believe in the possible validity of his claim. It is not necessary that the person asserting the claim should believe in its certain or even probable validity. It is enough if he believes in good faith that there is a substantial chance of its being sustained. Bad faith is treated as an abuse of the privilege stated in this Section.

The reason for the extremely broad privilege stated in Sec. 647 is explained in Comment *f* as follows:

The privilege stated in this Section is necessary to enable the claimant to preserve the enforceability of his claim. If, knowing that another is offering or about to offer land or other things for sale as his own, he fails to take advantage of a readily available opportunity to inform the intending purchaser or those likely to become purchasers, as

> when the sale is by auction, of his claim to the thing, he may preclude himself from afterwards asserting it against the purchaser. Therefore, he must be permitted without fear of liability to protect the enforceability of his claim by asserting it before the purchase is made.

The question of whether a defense of conditional privilege is available in a suit for injurious falsehood is initially a matter of law for the trial court. We said in *Horning v. Hardy,* 36 Md. App. 419, 373 A.2d 1273 (1977), quoting from W. Prosser, *Torts* Sec. 129 (4th Ed. 1971), that in a suit for injurious falsehood the defense of a conditional privilege is available under the following circumstances:

> If [the defendant] has a present, existing economic interest to protect, such as the ownership or condition of property ... he is privileged to prevent performance of the contract of another which threatens it; and for obvious reasons of policy he is likewise privileged to assert an honest claim, or bring or threaten a suit in good faith, to exercise the right of petition to public authorities or to settle his own case out of court. [36 Md. App. at 429.]

However, Prosser, Sec. 129 at 945, goes on to say that "where [the] interest [of the defendant] is merely one of prospective advantage, not yet realized, he has no such privilege."

Appellants argue that Dixon honestly believed that Benedict Associates, the partnership operated by the appellants, held an enforceable interest in the Clinton Woods property by reason of the judgments it held against PIM. They concede, however, that the judgments against PIM could not be enforced unless and until there was a successful judicial determination in the form of a decree lifting the corporate veil surrounding TPC. Therefore, the trial judge was correct in declaring that the interest on which the conditional privilege was asserted must have existed at the time the defamation occurred.

In *Leonard v. Wilson,* 150 Fla. 503, 8 So. 2d 12 (1942), the Supreme Court of Florida said:

> [I]n most of the cases where the question has been in issue it has been held that it is not sufficient that the maker or author had an honest and reasonable belief in the existence of the interest or duty; that is, good faith and honest or reasonable belief in the existence of the duty or interest is not considered in determining whether the particular occasion is a privileged one. The duty or interest on which the privilege is founded must actually exist.... [8 So. 2d at 14.]

*Accord, Johnson v. Hager,* 148 Kan. 461, 83 P.2d 621 (1938); *Garey v. Jackson,* 197 Mo. App. 217, 193 S.W. 920 (1917); *Gattis v. Kilgo,* 140 N.C. 106, 52 S.E. 249 (1905).

The trial court in the present case did not find that the appellants enjoyed a privilege to interfere with TPC's contractual relations with Ryland or Union Trust Company. The trial court held that as Benedict Associates had no interest in Clinton Woods, it possessed no conditional privilege as stated in Sec. 773 of the *Restatement of Torts,* quoted with approval by the Court of Appeals in *United Rental Equipment Co. v. Potts & Callahan Contracting Co.,* 231 Md. 552, 191 A.2d 570 (1963), as follows:

> One is privileged purposely to cause another not to perform a contract, or enter into or continue a business relation, with a third person by in good faith asserting or threatening to protect properly a legally protected interest of his own which he believes may otherwise be impaired or destroyed by the performance of the contract or transaction. [231 Md. at 560.]

It is here quite apparent that at the time Dixon undertook his course of conduct on behalf of Benedict Associates that partnership had no "legally protected interest" in Clinton Woods.

The trial court found that Dixon's motive was to "gain a pecuniary advantage in some respect out of the property in Prince George's County." This course of conduct, then, was not privileged. As stated by Professor Prosser in Sec. 129 at 946:

> Still less is there any privilege to interfere with the contract where there is no competitive relation, but the object is to put pressure upon the plaintiff and coerce him into complying with the defendant's wishes in some collateral matter — as where an employer is induced to discharge a workman in order to compel him to pay the defendant a debt, prevent him from bringing a suit, or force him to compromise a claim, or for the purpose of extorting money from him. Interference with contractual relations is not a legitimate method of securing such an advantage. [Footnotes omitted.]

Finally, the trial court found that even if, *arguendo,* there was a conditional privilege, Dixon's course of conduct negated any privileged which Benedict Associates might have enjoyed. As Professor Prosser said in Sec. 129 at 936-37:

> The means employed may, however, affect the defendant's privilege to interfere. The privilege of intentional invasion of the plaintiff's economic interests is limited to reasonable and proper means, by a restriction not unlike that which limits the defense of property to the use of reasonable force. Methods which are tortious in themselves, such as violence, threats and intimidation, defamation, . . . or the harassing of agents, will not be privileged even where the defendant is acting for a purpose justifiable in itself. . . . [Footnotes omitted.]

On the basis of our review of the record in this case, we cannot find that the trial court was erroneous in its conclusion that as a matter of law the appellants had no conditional privilege to defame TPC's title to the land in Prince George's County.

It is clear from the trial court's finding of facts that the court held there was knowing falsity or reckless disregard of the truth or both when Dixon defamed TPC's title to Clinton Woods. *See Jacron Sales Co., Inc. v. Sindorf,* 276 Md. 580, 350 A.2d 688 (1976); *Marchesi v. Franchino,* 283 Md. 131, 387 A.2d 1129 (1979). This factual conclusion accomplished two legal purposes: first, it overcame any conditional privilege which might have existed *vel non;* and second, it justified the award of punitive damages.

## II.

In order to support an award for punitive damages in a private defamation case, the plaintiff must establish that the defendant made the defamatory statements either knowing them to be false or in reckless disregard of the truth.[3] In order to reverse the trial court's finding of facts, we would be required to find in our review of the record that the trial court was clearly erroneous in reaching its conclusions. However, we do not find any error in the trial court's conclusions. The record is replete with evidence that Dixon in his effort to reach funds belonging to TPC to satisfy judgments against another corporation entered into a well orchestrated course of conduct designed to prevent TPC from completing its transactions with the title companies, the financial institutions, and the individual purchasers of lots owned by TPC. It is clear to us that the trial court committed no error in awarding punitive damages.

## III.

The trial court awarded the appellee the sum of $18,600 as compensatory damages in this case. Admittedly, an undetermined portion of that award represented counsel fees incurred by the appellee in defending the prior litigation between the parties in Prince George's County in which the

---

**3.** There was evidence in the record, exclusive of the claim for counsel fees which supported at least a portion of the compensatory damages awarded by the trial court and consequently supports the award of punitive damages.

appellants sought to pierce the corporate veil of PIM and TPC. No request for the allowance of counsel fees was made in that proceeding. The general rule in Maryland is clear "that other than usual and ordinary court costs, the expenses of litigation — including legal fees incurred by the successful party — are not recoverable in an action for damages. . . ." *Empire Realty Co. v. Fleisher,* 269 Md. 278, 285, 305 A.2d 144 (1974). *See also Taylor v. Wahby,* 271 Md. 101, 114-15, 314 A.2d 100 (1974); *Freedman v. Seidler,* 233 Md. 39, 47, 194 A.2d 778 (1963).

In a recent case decided by this Court, *Archway Motors v. Herman,* 41 Md. App. 40, 394 A.2d 1228 (1978), we discussed an exception to the general rule known as the collateral litigation exception. Quoting from *McGaw v. Acker, Merrall, & Condit Co.,* 111 Md. 153, 160, 73 A. 731 (1909), we said:

> The general rule is that costs and expenses of litigation, other than the usual and ordinary Court costs, are not recoverable in an action for damages, nor are such costs even recoverable in a subsequent action; but where the wrongful acts of the defendant has involved the plaintiff in litigation with others, or placed him in such relation with others as make it necessary to incur expense to protect his interest, such costs and expense should be treated as the legal consequences of the original wrongful act. [41 Md. App. at 44-45.]

We emphasized in *Archway, supra,* that the exception applies only when the collateral litigation involves a party other than the defendant. We went on in *Archway* to say that: "*McGaw, supra,* makes it clear that a claimant seeking counsel fees may prevail only when the wrongful acts of one of the parties to a contract had involved the claimant in litigation with others arising out of the contract." 41 Md. App. at 45.

We find nothing in the facts in this case which would make the collateral litigation exception applicable to the case at bar.

Appellee cites *Walker v. Ruggles,* 540 S.W.2d 470 (Tex. Civ. App. 1976) as the case upon which the trial judge relied as authority for including attorney's fees in the assessment of compensatory damages in this case. Further research, however, indicates that this case is not a correct application of the law of Texas. The later case of *American National Bank v. First Wis. Mfg. Trust,* 577 S.W.2d 312 (Tex. Civ. App. 1979), an action for slander of title, is apposite to the case at bar. In discussing the inclusion of attorney's fees in the measure of damages the Texas court, in *American National Bank,* said:

> Plaintiff's attempt to support [the] award of actual damages by the evidence relating to attorney's fees is likewise unavailing. Such fees are not recoverable in an action of slander of title under the holding of this Court in *Shell Petroleum Corporation v. Howth,* 133 S.W.2d 253, 264 (Tex. Civ. App. — Beaumont 1939), reversed on other grounds, 138 Tex. 357, 159 S.W.2d 483 (1942). We are unable to find where this square holding by this Court has been overruled.
>
> Plaintiff argues that the recovery of attorney's fees is authorized as part of the "expense of litigation" in removing the cloud on its title. In so contending, plaintiff relies upon language found in *Walker v. Ruggles, supra,* 540 S.W.2d at 474-475. Perhaps this is a sound rule to be followed in the future; but, it must be admitted, it is contrary to the generally prevailing rule that such fees are not recoverable in either contract or tort actions in the absence of a statute or contract. [Citations omitted.] [*Id.* at 319-20.]

Appellee also points out that counsel fees may be awarded as damages in cases where there are "special circumstances" present as well. *Freedman v. Seidler, supra,* and *Harry's Thrifty Tavern, Inc. v. Pitarra,* 224 Md. 56, 166 A.2d 908

(1961), are cited as authority for this proposition, but our reading of these cases convinces us that the facts of each of them makes them inapposite to the case at bar.

Finally, appellee urges that the trial court's award of counsel fees may be upheld under Rule 604 b which provides as follows:

> In an action or part of an action, if the court finds that any proceeding was had (1) in bad faith, (2) without substantial justification, or (3) for purposes of delay the court shall require the moving party to pay the adverse party the amount of the costs thereof and the reasonable expenses incurred by the adverse party in opposing such proceeding, including reasonable attorneys' fees.

We think appellee's position as to Rule 604 b is untenable for several reasons. Initially, we do not believe that the institution or prosecution of the original suit would qualify under any of the three grounds above recited. Secondly, it seems crystal clear to us that appellee had a right to have whatever legal rights he had, as doubtful as they may have been, determined in an appropriate forum. Finally, we conclude the case at bar is not the appropriate vehicle to claim an award of counsel fees in a case decided two years before the instant matter. If appellee felt it was entitled to relief under 604 b, an appropriate motion should have been made in the original proceedings, and the judge most familiar with the facts should have been requested to make such an award under Rule 604 b in that case. See *Colonial Carpets, Inc. v. Carpet Fair, Inc.,* 36 Md. App. 583, 374 A.2d 419 (1977).

We conclude, finally, that the trial court erred in including in its award for compensatory damages any allowance for counsel fees in the Prince George's County proceedings. As we are unable to determine what portion of the $18,600 awarded as compensatory damages was represented by the allowance for counsel fees, we shall strike that judgment and

remand to the trial court for a recalculation of compensatory damages.

> *Judgment of $18,600 for compensatory damages stricken, remanded for further proceedings, judgment for punitive damages affirmed.*
> *⅔ costs to be paid by appellant, ⅓ by appellee.*