**NEUROTRON, INC.**

**v.**

**AMERICAN ASSOCIATION OF ELECTRODIAGNOSTIC MEDICINE**

**No. CIV.A. WMN–00–514.**

United States District Court, D. Maryland.

Aug. 13, 2001.

John M.G. Murphy, Barry L. Gogel, Ober Kaler Grimes and Shriver, Balti-

more, MD, Jeffrey H. Scherr, Kevin Francis Arthur, Kramon and Graham, Baltimore, MD, Charles I. Artz, Artz & Associates, Harrisburg, PA, Andrew W. Barbin, Gleason and Barbin, P.C., Harrisburg, PA, for plaintiff.

Donald B. Verrilli, Jr., Washington, DC, Robert M. Portman, Deanne E. Maynard, Katherina A. Fallow, Jared O. Freedman, Jenner and Block, Washington, DC, for defendant.

## MEMORANDUM

NICKERSON, District Judge.

Defendant American Association of Electrodiagnostic Medicine ("AAEM") brings a motion for Summary Judgment (Paper No. 44) against Plaintiff Neurotron, Inc. The motion has been fully briefed and is ripe for decision. Upon a review of the pleadings and the applicable case law, the Court determines that no hearing is necessary (Local Rule 105.6) and that Defendant's motion will be granted.

## I. BACKGROUND

Defendant AAEM is a Minnesota association of medical professionals, primarily neurologists, physical medicine and rehabilitation specialists. Compl. at ¶¶ 2 & 37. AAEM publishes an official journal, *Muscle & Nerve*, and maintains an Internet website. *Id.* at ¶¶ 44 & 54. Plaintiff Neurotron is a Maryland manufacturer and distributor of electrodiagnostic medical devices, specifically the Neurometer® CPT ("N–CPT"). *Id.* at ¶¶ 1 & 6–9. The N–CPT is a diagnostic tool that allows various medical professionals to test and diagnose neurological disorders and impairments. *Id.* at ¶¶ 9, 24 & 34.

In 1989, Neurotron's Dr. Jefferson Katims [1] asked AAEM to conduct a Technology Review of the N–CPT as he felt there was a sufficient number of favorable articles published at that point to merit such a review. AAEM declined Dr. Katims' request. Three years later, in 1992, AAEM changed its position and decided that a review of the N–CPT was warranted. The review was conducted by the Equipment and Computer Committee headed by Dr. George Baquis.[2] In conducting the review, Dr. Basquis identified over 200 sources of information on the N–CPT, including sources identified by Neurotron as favorable to the product. Dr. Basquis created a criteria for analyzing the scholarly merit of the sources which resulted in a final pool of 44 articles.

In April 1999, *Muscle & Nerve* published the article authored by the AAEM Equipment and Computer Committee entitled "Technology Review: The Neurometer® Current Perception Threshold (CPT)." Compl. at ¶ 44. The review concluded that "the information in these publications is insufficient to make conclusions about the usefulness of this form of sensory testing at the present time." Opp. Exh. 1. The article was revised and republished in September 1999 under the same title and was also placed on AAEM's website. Compl. at ¶ 54.

Following publication of the original article, Dr. Katims forwarded a lengthy response to AAEM, demanding that they print his response and retract the article. Compl. at ¶ 50. Dr. Katims was notified that the article would not be retracted, his

---

1. Dr. Katims is the inventor of the Neurometer, a principal of Neurotron and a member of AAEM.

2. The parties disagree as to whether the article was authored and/or reviewed by the entire committee or by Dr. Baquis exclusively. As this issue has no bearing on the disposition of this case, it need not be addressed.

response would not be published in *Muscle & Nerve* due to its length, and that if he wanted to proffer a response, it must conform to the 500 word limit for letters to the editor. Dr. Katims tendered no response.

Plaintiff claims that as a result of the article, insurers denied reimbursement claims for N–CPT testing. Compl. at ¶ 42. Plaintiff brought suit against AAEM on February 24, 2000 alleging injurious falsehood, false light commercial disparagement, civil conspiracy, violation of the Lanham Act 15 U.S.C. § 1125(a)(1)(B), and tortious interference.

## II. PROCEDURAL HISTORY

On February 24, 2000, Plaintiff filed a motion in this Court seeking a temporary restraining order. This motion was denied on February 25, 2000, by Chief Judge Motz.[3] Plaintiff then filed a motion for preliminary injunction, which, after a full hearing, the undersigned denied on June 15, 2000. Paper No. 31. Defendant now brings a motion for summary judgment under Federal Rules of Civil Procedure 56(c).

## III. LEGAL STANDARD

Summary judgment is appropriate under Rule 56(c) where "there is no genuine issue as to any material fact and ... the moving party is entitled to summary judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and a fact is material if, when applied to the substantive

law, it affects the outcome of the litigation. *Id.*

A party seeking summary judgment bears the initial responsibility of informing the court of the basis of its motion and identifying the portions of the opposing party's case which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The non-moving party is entitled to have "all reasonable inferences ... drawn in its respective favor." *Felty v. Graves–Humphreys Co.,* 818 F.2d 1126, 1129 (4th Cir.1987).

If the movant can demonstrate that there indeed is no genuine issue of material fact and summary judgment should be entered as a matter of law, the burden shifts to the non-moving party to produce sufficient evidence that a triable issue of fact exists. *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548. The non-moving party must proffer such evidence through the use of depositions, affidavits or other documentation. *Id.* These evidentiary materials must show facts from which the finder of fact could reasonably find for the non-moving party. *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505. Unsupported speculation is insufficient to defeat a motion for summary judgment. *Felty,* 818 F.2d at 1128 (citing *Ash v. United Parcel Serv., Inc.,* 800 F.2d 409, 411–412 (4th Cir.1986)). Moreover, a mere "scintilla of evidence" is not enough to defeat a motion for summary judgment.

At the summary judgment phase, it is not appropriate for the court to make credibility determinations, weigh the evidence, or draw inferences from the facts

---

**3.** Chief Judge Motz did, however, require that AAEM post their standard disclaimer on the website stating that the article was not to be used as the basis for reimbursement decisions by insurers. This disclaimer is identical to the one appearing in the printed version of the article. Paper No. 5; Opp. at 19.

which are adverse to the non-moving party; these are jury functions. *Id.*

## IV. DISCUSSION

### A. THE LANHAM ACT

Plaintiff claims that Defendant violated the Lanham Act ("Act") by publishing false and disparaging commercial speech in competition with the N–CPT to third parties. Compl. at ¶¶ 90–105. Defendant counters that the Lanham Act does not apply in this case because: 1) the Technology Review is not commercial speech; 2) AAEM is not in competition with Neurotron; 3) the article does not promote AAEM products that compete with Neurotron; and, 4) the Technology Review is the kind of speech that Congress excluded from the Act.

The Lanham Act was enacted in 1946 as a regulation on trademarks. In 1988 it was amended to include new language regulating false advertising. The relevant section of the Act is § 1125(a)(1)(B), which states:

(a) Civil Action

(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any work, term, name, symbol, or device, or any combination thereof, or any false designation or origin, false or misleading description of fact, or false or misleading representation of fact which -

. . . . .

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another persons goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act. 15 U.S.C.A. § 1125(a)(1)(B). Since its inception, the Act has caused confusion lead-

ing to inconsistent rulings from the district courts. *See* Jean Wegman Burns, *Confused Jurisprudence: False Advertising Under the Lanham Act,* 79 B.U.L.Rev. 807 (1999). There are, however, a small number of judicial opinions that attempt to provide clarity.

The seminal case on the application of the Lanham Act is *Gordon & Breach Science Publishers, S.A. v. American Institute of Physics,* 859 F.Supp. 1521 (S.D.N.Y.1994). There, Judge Sand announced,

[t]he principles from the cases and legislative history may be summed up as follows: In order for representations to constitute 'commercial advertising or promotion' under Section 43(a)(1)(B), they must be: (1) commercial speech; (2) by a defendant who is in commercial competition with plaintiff; (3) for the purpose of influencing consumers to buy defendant's goods or services ... [and] the representations (4) must be disseminated sufficiently to the relevant purchasing public to constitute 'advertising' or 'promotion' within that industry.

*Id.* at 1536. Although this four part test has not been expressly adopted by the Fourth Circuit, it has been relied upon by courts within this circuit. *See Huntingdon Life Sciences, Inc., v. Rokke,* 978 F.Supp. 662, n. 2 (E.D.Va.1997).

The threshold issue for a Lanham Act violation is that the complaining party must establish that the statements at issue constitute commercial speech. *Id.* at 666. This is true whether or not the speech is in fact false. Speech that is false, but non-commercial, is nevertheless outside the reach of the Act. *See Gordon & Breach,* 859 F.Supp. at 1536.

The Supreme Court has defined commercial speech as speech proposing no more than a commercial transaction.

*United States v. Edge Broad. Co.,* 509 U.S. 418, 426, 113 S.Ct. 2696, 125 L.Ed.2d 345 (1993). Alternatively, commercial speech can be more broadly defined as an " 'expression related solely to the economic interests of the speaker and its audience.' " *City of Cincinnati v. Discovery Network, Inc.,* 507 U.S. 410, 422, 113 S.Ct. 1505, 123 L.Ed.2d 99 (1993) (quoting *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of New York,* 447 U.S. 557, 561, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980)). The article at issue does not fall within either definition.

■ This Court previously expressed the opinion that "it is unlikely that Plaintiff can establish that the Defendant's article is commercial speech." Prelim. Inj. Mem. at 9. Since the preliminary injunction hearing, Plaintiff has come forth with no evidence to suggest that the Court should now change its position.

Plaintiff contends that AAEM had a financial motive for publishing such a disparaging article because the N–CPT can be used by medical professionals other than those who are AAEM members. Yet, nowhere in the article do the authors advocate for a commercial transaction. It is neither suggested that the reader buy any product or service, nor that they refrain from buying any product or service. AAEM does not say that the product is bad, that doctors and patients should only seek out Neurologists or physical medicine specialists for testing, or that the N–CPT not be used at all. It merely states that "the reviewers concluded that information in these publications is insufficient to make conclusions about the usefulness of this form of sensory testing at the present time." Mot. Exh. 4(A).

Moreover, it is difficult to see how the article could meet the broader standard, i.e., related "*solely* to the economic interests of the speaker and its audience."

*City of Cincinnati,* 507 U.S. at 422, 113 S.Ct. 1505 (emphasis added). *Muscle & Nerve* is published, like many trade journals, for the edification of the association's members. While Plaintiff is correct that the article is not removed from commercial speech restrictions simply because it is educational, it does not follow that the article can not be protected speech if the content is something other than *purely* educational. In *Riley v. National Federation of the Blind of North Carolina,* the Court found that when commercial and non-commercial speech are inextricably linked, the entire speech loses its commercial character. 487 U.S. 781, 796, 108 S.Ct. 2667, 101 L.Ed.2d 669 (1988). Therefore, even if some language in the article is commercial in nature, it is not necessarily commercial speech.

■ The possible combination of commercial and non-commercial speech under the broad *City of Cincinnati* standard necessitates further inquiry into the purpose of the speech. There is no bright line commercial/non-commercial test in situations such as this. *Gordon & Breach,* 859 F.Supp. at 1540 n. 7 and accompanying text; *see also City of Cincinnati,* 507 U.S. at 419, 113 S.Ct. 1505. Instead, the court may take several factors into consideration. These factors are: 1) whether the entity has a purpose "beyond the solely commercial;" 2) even if the speech is commercial, whether it is advertising constitutionally protected material; 3) whether the advertising at issue is the main purpose of the article; 4) whether there is a connection between the author and the defendant and to what extent; and, 5) whether finding the defendant liable will likely keep these ideas out of the marketplace altogether. *Gordon & Breach,* 859 F.Supp. at 1540–41.

■ The Technology Review is published by AAEM, a non-profit organization, whose purpose is not only to lobby and advocate for its members, but also to provide educational services such as informing members of current trends in the industry through publications such as *Muscle & Nerve*, or by conducting educational seminars. None of these activities are commercial in nature. Arguably, the only thing promoted by the article is further study and publication of additional articles so that some conclusion can be drawn about the effectiveness of the N–CPT.

Plaintiff claims that Dr. Baquis' connection to Defendant as an ex-board member provides him with a commercial motivation to dissuade the use of the N–CPT. But, such a connection, by itself, is insufficient to warrant a finding that, in this context, the speech was commercial. *See Gordon & Breach*, 859 F.Supp. at 1541 (stating that an officer of the association does not have a sufficient connection to "convert fully protected commentary into less-protected commercial speech.").

Finally, chilling the speech of AAEM in this instance would likely prevent all debate about such subjects from entering into the marketplace. AAEM is the leading association for this profession and muting their voice on important issues such as the effectiveness of treatments is too great a cost to support Plaintiff's contentions. Nowhere has it been shown that the article was commercial, let alone that the primary purpose of publication was related "*solely* to the economic interests of the speaker and its audience." *City of Cincinnati*, 507 U.S. at 422, 113 S.Ct. 1505 (emphasis added). Nevertheless, even if there is some commercial aspect of the article, it would not be considered commercial speech under *Gordon & Breach* because of its public significance and status as an academic piece published by a non-profit organization. *See id.* at 1541. If Plaintiff were to prevail on this issue, any trade journal that gave less than a favorable report about a product would be open to suit.

## B. INJURIOUS FALSEHOOD

■ Although the speech at issue here is not considered commercial speech, Defendant may still be liable to Plaintiff if the speech was an injurious falsehood.

> Injurious falsehood or disparagement [is defined as] . . . the publication of matter derogatory to the plaintiff's title to his property, or its quality, or to his business in general, or even to some element of his personal affairs, of a kind calculated to prevent others from dealing with him, or otherwise to interfere with his relations with others to his disadvantage.

*Nat'l. Bd. for Certification in Occupational Therapy, Inc. v. American Occupational Therapy Ass'n.*, 24 F.Supp.2d 494, 511 n. 27 (D.Md.1998) (quoting *Horning v. Hardy*, 36 Md.App. 419, 426–27, 373 A.2d 1273 (1977)). Furthermore, "[t]o maintain a claim for injurious falsehood, [Plaintiff] must establish that [Defendant], *with malice*, published a known falsity to a third party, that caused special damages." *Id.* (emphasis added).

■ Defendant argues that Plaintiff's injurious falsehood claims must fail because it cannot meet the actual malice standard laid out in *New York Times v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).[4] That standard bars

---

4. This standard is also applicable to injurious falsehood claims. *See Horning v. Hardy*, 36 Md.App. 419, 426, 373 A.2d 1273 (1977) (stating that "in order to recover the plaintiff must show malice")(citing *Beane v. McMullen*, 265 Md. 585, 291 A.2d 37 (1972)); *see generally Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 104 S.Ct. 1949, 80 L.Ed.2d 502

liability for speech unless the plaintiff can prove that the speech was made "with knowledge that it was false or with reckless disregard of whether it was false or not." *Id.* at 280, 84 S.Ct. 710. For the purposes of summary judgment, "where the factual dispute concerns actual malice ... the appropriate summary judgment question will be whether the evidence in the record could support a reasonable jury finding either that the plaintiff has shown actual malice by clear and convincing evidence or that the plaintiff has not." *Anderson,* 477 U.S. at 255–56, 106 S.Ct. 2505.

■ Here, Plaintiff has not shown any evidence, let alone clear and convincing evidence, tending to prove actual malice. For example, Plaintiff's characterization of Defendant's *"Strategic Plan"* as indicative of Defendant's economic motivation to disparage the N–CPT misrepresents that plan. The plan is published on Defendant's website and identifies the need for the association to adapt to modern standards in the field. The goal of the plan is to revise the purpose of the association to conform to these new standards. While the plan does contain the language "competing emerging technologies," it does so only by quoting a letter sent to the association voicing this concern. Competing technologies are not a stated concern of Defendant. In fact, the plan proposes "that the scope of the association be broadened to include many types of diagnostic tools," and that AAEM "should broaden our potential member base to include physicians who may not practice electrodiagnostic medicine." Opp. Exh. A. This *"Strategic Plan"* does not demonstrate, as Plaintiff asserts, Defendant's economic motivation to disparage the N–CPT. Instead, it more clearly supports AAEM's efforts to incorporate new technologies, such as the N–CPT, and non-specialized physicians into its ranks.

Moreover, the Technology Review cannot be seen as an attempt to dissuade insurers from medical reimbursement for the N–CPT. The review contains a disclaimer that specifically states "[t]his review was not written with the intent that it be used as a basis for reimbursement decisions." Mo. Exh. 1. Such a disclaimer clearly places insurers on notice that decisions based on the review would be inappropriate.

Plaintiff's other evidence on this issue is similarly deficient to show that AAEM clearly and convincingly acted with actual malice when writing and publishing the review. Because Plaintiff cannot prove actual malice, its injurious falsehood claim must fail.[5]

## CONCLUSION

For the above stated reasons, Defendant's motion for summary judgment will be granted. A separate Order will issue.

### *ORDER*

Pursuant to the foregoing memorandum, and for the reasons stated therein, IT IS this ___ day of August, 2001, by the United States District Court for the District of Maryland, hereby ORDERED:

1. That Defendant's Motion for Summary Judgment (Paper No. 44) is hereby GRANTED;

2. That judgment is hereby entered in favor of Defendant and against Plaintiff;

---

(1984) (applying the actual malice standard to an article that allegedly disparaged plaintiff's product).

**5.** Plaintiff's other claims need not be addressed as Plaintiff admits that, if Defendant prevails on the Lanham Act and injurious falsehood claims, the other claims will fall as well. *See* Pl.'s Opp. Def.'s Prelim. Obj. at 12.

3. That this case is hereby CLOSED;

4. That any and all prior rulings made by this Court disposing of any claims against any parties are incorporated by reference herein and this order shall be deemed to be a final judgment within the meaning of Fed.R.Civ.P. 58; and

5. That the Clerk of the Court shall mail or transmit copies of the foregoing memorandum and this order to all counsel of record.