CAMBRIDGE TITLE COMPANY,
and Henry I. Louis, Plaintiffs,

v.

TRANSAMERICA TITLE INSURANCE
COMPANY, Defendant.

Civ. No. H–90–1455.

United States District Court,
D. Maryland.

March 13, 1992.

Benjamin Rosenberg and Rosenberg, Proutt, Funk & Greenberg, Baltimore, MD, for plaintiffs.

Gregg L. Bernstein and Miles & Stockbridge, Baltimore, MD, for defendant.

MEMORANDUM OPINION

ALEXANDER HARVEY, II, Senior District Judge.

In this civil action, a title company and its principal officer are seeking substantial damages from a title insurance company because of the latter's termination of an agency relationship between the parties. Presently pending are two motions filed by defendant, an earlier one seeking partial summary judgment and a later one seeking summary judgment in its entirety. Plaintiffs are Cambridge Title Company (hereinafter "Cam-

bridge"), a Maryland corporation with its principal place of business in Baltimore, and Henry I. Louis (hereinafter "Louis"), the President and principal stockholder of Cambridge. Defendant is Transamerica Title Insurance Company (hereinafter "Transamerica"), a California corporation. Transamerica's termination of its agency relationship with Cambridge occurred in October of 1989.

Pretrial proceedings in the case have been extensive, and the parties have in their papers relied on the voluminous discovery that has been undertaken. Memoranda and numerous affidavits and exhibits in support of and in opposition to the pending motions have been submitted by the parties. Oral argument has been heard in open Court. Following its review of the massive record in this case, this Court has concluded that defendant's pending motions for summary judgment and for partial summary judgment should both be granted.

# I

## FACTS

Until late 1989, plaintiff Cambridge provided title insurance policies to purchasers of real estate and to lenders whose interests were secured by real estate. Cambridge also provided other services to its customers, including the safekeeping and disbursement of funds to be paid at settlements of various real estate transactions. Buyers and sellers regularly deposited funds in escrow accounts maintained by Cambridge, and Cambridge later distributed such funds to the proper parties.

Cambridge did not itself underwrite the risks insured by the policies it issued. Rather, Cambridge contracted with a title insurance company for the underwriting of any title insurance policies which Cambridge issued. Transamerica is a title insurance company which provides underwriting services throughout the country to independent agencies like Cambridge.

On October 29, 1986, Cambridge and Transamerica entered into an Agency Agreement, pursuant to which Transamerica agreed to underwrite title insurance policies

issued by Cambridge. In pertinent part, this Agency Agreement provided:

IV. *Duties of [Cambridge]*

[Cambridge] shall:

A. Receive and process applications for title insurance in a timely, prudent and ethical manner with due regard to recognized title insurance underwriting practices and in accordance with the rules and instructions of TRANSAMERICA.

\* \* \* \* \* \*

D. Send Transamerica a copy of each policy and endorsement issued by [Cambridge].

E. Keep a policy register in a form approved by TRANSAMERICA showing the disposition of all policies and other pre-numbered forms furnished by TRANSAMERICA. Upon request by TRANSAMERICA, [Cambridge] shall furnish a statement accounting for all such forms.

F. Keep safely in trust accounts separate from [Cambridge's] personal or operating accounts all funds received by [Cambridge] from any source in connection with transactions in which TRANSAMERICA'S title insurance is involved and to disburse said funds only for the purposes for which the same [were] entrusted.

\* \* \* \* \* \*

XII. *Shortages of Funds*

In the event a shortage is revealed or discovered in [Cambridge's] accounts of funds entrusted to [Cambridge] by others or in the remittances due TRANSAMERICA hereunder, then TRANSAMERICA may declare immediately due and payable any debts for which TRANSAMERICA may be responsible or have a liability therefor. TRANSAMERICA shall have a lien on all property of [Cambridge] as security for the repayment thereof. On demand by TRANSAMERICA, [Cambridge] shall immediately make good the shortage or convey and deliver possession of such property to TRANSAMERICA. A conveyance of such property shall not of

itself relieve [Cambridge] of further liability for said shortage, but may be utilized to mitigate the liability of [Cambridge] therefor. .

## XV. *Termination of Contract*

In the event of material breach of contract by either party hereto, the other may terminate immediately by giving notice by registered or certified mail to the other party.... Material breach of contract on the part of [Cambridge] includes material deviation from the rules promulgated by TRANSAMERICA and furnished to [Cambridge] and recognized title insurance underwriting practices. In the event of termination, [Cambridge] shall at once furnish to TRANSAMERICA a complete accounting of all remittances due hereunder and of all commitments, policies and endorsements issued by [Cambridge] and unreported to TRANSAMERICA. [Cambridge] shall at once remit to TRANSAMERICA all sums then due together with copies of all commitments, policies and endorsements so issued....

In July of 1987, the parties amended the Agency Agreement so as to give Cambridge the right to operate as the exclusive issuing agent for Transamerica in the Baltimore area. In return for being named exclusive agent for Transamerica, Cambridge agreed not to contract with any other title insurance company for the underwriting of policies issued by Cambridge. The Agency Agreement, as amended, was to remain in effect until June of 1992, at which time it would be subject to automatic renewal for an additional five years.

In early October of 1986, before the parties had entered into the Agency Agreement, Transamerica had conducted a prospective agency review, wherein it was noted that Cambridge's escrow accounts had not been properly reconciled. Plaintiff Louis thereafter assured Transamerica that he would begin to reconcile the escrow accounts monthly. In August of 1988, Transamerica conducted a second agency review of Cambridge which revealed that Cambridge had not reconciled its escrow accounts as promised, that there was an absence of controls over Cambridge's accounts and that a backlog existed in the processing by Cambridge of its policies. In a meeting on October 5, 1988, Louis assured Transamerica that Cambridge would resolve these problems.

In June of 1989, Leo Hebert, an auditor employed by Transamerica, conducted a third agency review of Cambridge's accounts. Based on this review, Hebert, on August 14, 1989 [1], issued a report calling attention to numerous "serious concerns" including Cambridge's failure to reconcile its escrow accounts and its lack of adequate controls over the use of settlement checks. Hebert's report indicated, *inter alia,* that:

> [t]he lack of escrow reconciliation and controls have been raised in two previous audits. At this time, the agent has yet to implement any controls or procedures recommended. It appears that the agent is paying "lip service" to anything required by the company. It also appears that the agent will advance funds from the escrow account to fund settlements that are not adequately funded at the time.

Hebert further observed that Cambridge "appears to do whatever it takes to obtain business and close a deal, with little or no regard for Transamerica's policy" concerning recordkeeping, that Cambridge was not issuing policies in a timely manner, that Cambridge was not reporting or remitting policies and premiums in a timely manner, and that Cambridge was not using policy registers on a consistent basis.

David Porter, President of Transamerica, read Hebert's report and concluded that the Agency Agreement with Cambridge should be immediately terminated. Regional personnel of Transamerica thereafter persuaded Porter not to terminate Cambridge's agency and instead "to give it one more try." On September 7, plaintiff Louis and Terry Cellini, an officer of Cambridge, met with Eric Carstensen, Transamerica's State Manager, and Nancy Koch, Transamerica's Assistant General Counsel, to discuss Hebert's report of August 14, 1989. Carstensen and Koch informed Louis that each of the deficiencies

---

1. Unless noted otherwise, all events discussed hereinafter occurred in 1989.

noted in Hebert's report constituted separate material breaches of the Agency Agreement.

On September 13, Richard Wilson, Vice President and Division Manager of Transamerica, wrote Louis as a follow-up to the September 7 meeting. In his letter, Wilson asserted that ten separate managerial deficiencies of Cambridge constituted material breaches of the Agency Agreement. These were:

(1) failure to reconcile existing and dormant escrow accounts;

(2) failure to maintain adequate controls over escrow accounts, checks, deposits, and wire transfers;

(3) improper advances of funds from escrow for disbursements where receipts from escrow were not yet obtained;

(4) insufficient title searches or "bring-to-dates";

(5) repeated lack of compliance with "high liability" approval procedure;

(6) improper furnishing of indemnity agreements to third parties;

(7) inadequacies in post-closing follow-up;

(8) failure to record releases or satisfactions of deeds of trust;

(9) failure to report policies to Transamerica or use policy registers on a consistent basis; and

(10) failure to remit policy premiums due to Transamerica.

Wilson's letter required that Cambridge within thirty days submit a progress report to Transamerica and within sixty days provide Transamerica with proof of reconciliation of the escrow accounts. Wilson advised Louis, "[i]f the following matters are not corrected to the satisfaction of the Company within the time periods specified ... Transamerica will declare our Agency Agreement void and terminate our agency relationship."

On September 19, Louis wrote Wilson and stated his agreement with virtually all of Wilson's assertions. Louis assured Wilson that he was taking Wilson's letter "with true seriousness and belief [*sic*] if all items are not truly satisfactory to Transamerica, that our agency contract will be terminated." Although the record indicates that Louis and other personnel of Cambridge thereafter ostensibly attempted to comply with Transamerica's demands, it is clear that little or no progress was made towards this end.

The record conclusively establishes that in the Fall of 1989 Cambridge had been and continued to be mismanaged and that, by October, its operations and records were in such disarray that compliance with Wilson's letter was virtually impossible. In late September and early October, Cambridge was repeatedly writing overdrafts on its escrow accounts. In deposition testimony, Joel Parker, Vice–President and Regional Financial Officer of First American Title Insurance Company, testified that serious deficiencies existed in Cambridge's escrow accounting controls and that these deficiencies violated established standards in the title insurance industry.[2]

In her affidavit, Linda DiCarlo, Cambridge's bookkeeper, has stated that Cambridge's books and records were in poor condition. DiCarlo has further asserted that Louis refused to take necessary remedial steps and that Cambridge's accounts and records were so disorganized that complete reconciliation would have been "difficult and time consuming and would have required the investment of substantial accounting resources." Louis himself has admitted in deposition testimony that monthly reconciliation of escrow accounts is the standard practice in the industry but that the escrow accounts of Cambridge were not reconciled in this manner.

On or about October 2, Transamerica sent Hebert back to Cambridge to evaluate the condition of the escrow accounts. Hebert worked with Cambridge's bookkeeper over a period of days and eventually concluded that no progress had been made toward reconciliation of the escrow accounts and that, for unknown reasons, it appeared that a shortfall of $1.3 million existed in those accounts.

**2.** Plaintiffs have not contradicted Parker's testimony with the testimony of another expert in the title insurance industry.

On October 9, Transamerica procured a credit report on Louis from Trans Union Corporation (hereinafter "Trans Union").[3] This credit report was ordered as a part of Transamerica's investigation into the apparent substantial shortfall thought to exist in Cambridge's escrow accounts. Transamerica wanted to ascertain whether there was any indication from the status of Louis' personal finances that Louis may have been making personal use of funds from Cambridge's escrow accounts.[4]

As a result of Hebert's October review of the Cambridge escrow accounts, Harold Hayes, Vice–President and Regional Counsel of Transamerica, visited Cambridge and, from his own investigation, confirmed that its books and records were in disarray. Porter was then informed of Cambridge's condition, and he made the decision on October 16 to terminate the agency relationship. In his deposition testimony, Porter has stated that this decision was based on the numerous deficiencies noted in audits and correspondence and on the fact that Cambridge represented a serious risk to Transamerica because of Cambridge's failure to comply with Transamerica's standards. Porter considered the reported shortfall in the escrow accounts as merely one factor among others, his experience having indicated that such preliminary estimated shortfalls are often inaccurate.

By letter of October 16, Hayes advised Louis that Transamerica was immediately terminating the Agency Agreement and that:

> [t]he material breaches of contract have been the subject of both correspondence and discussion with you.... You are also aware of what we consider to be lack of progress on the part of Cambridge ... in remedying the deficiencies as well as additional concerns raised by the on-going in-

vestigation by our internal auditors, which concerns include what appear to be shortfall [sic] in the escrow accounts.

Hayes' letter further states that, pursuant to the terms of the Agency Agreement, Transamerica "hereby declares immediately due and payable all debts owed by Cambridge ... and asserts its right to a lien on all property of Cambridge ... as security for repayment of the debts. Transamerica requests that you undertake immediately to deliver possession of all property owned by Cambridge...."

On the evening of October 16, Louis met with Jeffrey Selby, a local officer of the Commonwealth Land Title Insurance Company (hereinafter "Commonwealth"), to inquire as to whether Commonwealth would be interested in executing an agency agreement with Cambridge or in purchasing Cambridge's assets. In his deposition testimony, Louis has stated that during this October 16 meeting he told Selby that Transamerica had terminated Cambridge's agency and that Transamerica was claiming that a significant shortfall existed in Cambridge's escrow accounts. On October 17, Louis met with Selby and Hayes. According to Louis, Hayes told both Selby and Louis that Transamerica would not assert a lien on Cambridge's files or other assets.

Louis claims that on the following day, October 18, Hayes advised that Transamerica would assert a lien on Cambridge's inventory and assets. According to Louis, with Selby present, Hayes pointed to Louis and stated that "You owe me a million and a half dollars." Thereafter, Commonwealth decided not to purchase Cambridge from Louis but instead negotiated directly with Transamerica for the purchase of Cambridge's on-going business or "files."[5] On

---

3. Trans Union and Transamerica are not related.

4. This was not the first time that Transamerica had ordered a credit report on Louis. In March of 1989, Transamerica had obtained a credit report on Louis from Trans Union pursuant to its annual review of all of its agents. Transamerica regularly procures credit reports concerning principals of its agents. The record does not indicate whether or not Louis or other principals

of Transamerica agents had previously authorized the procurement of these reports.

5. Commonwealth is owned by The Reliance Group (hereinafter "Reliance"). In September of 1989, Reliance was negotiating to purchase the parent corporation of Transamerica, and in early 1990, Reliance acquired the stock of Transamerica's parent. Plaintiffs contend that Transamerica perceived Cambridge's exclusive agency

October 20, Commonwealth, Transamerica and Cambridge executed an agreement whereby Commonwealth assumed responsibility for Cambridge's remaining files and paid Transamerica a certain amount per file.

During this period, representatives of Cambridge and Transamerica, together with their respective counsel, met repeatedly in an effort to negotiate the logistical problems created by termination of the parties' agency relationship. Louis agreed to give Transamerica full access to all of Cambridge's records and gave Transamerica personnel signatory authority on Cambridge's accounts at Signet Bank of Maryland (hereinafter "Signet Bank"). After a meeting with Cambridge and Transamerica representatives on October 17, James Higgins of Signet Bank wrote a memorandum to his file stating that Transamerica "suspects fraud or misaccounting of funds with settlement transactions performed by Cambridge Title." It was Higgins' understanding that Transamerica would have authority to dishonor checks which were not properly identified in Cambridge's records.[6]

On October 18, Cambridge and Transamerica entered into a formal Escrow Agreement providing: (1) that Transamerica would assume control over Cambridge's accounts at Signet Bank; (2) that Transamerica would provide funding for all checks which represented obligations insured by Transamerica; (3) that Louis would lend Cambridge $50,000 as collateral to be placed in its escrow accounts under the control of Transamerica; (4) that Transamerica would be appointed as escrow agent to review any checks which Signet Bank dishonored for insufficient funds and which did not represent obligations of Transamerica under issued policies; and (5) that Louis' $50,000 loan would be drawn upon to pay any dishonored checks.

On October 23 and 24, *The Daily Record*, a local business journal, published articles concerning Transamerica's termination of Cambridge's agency. Although representatives of Transamerica are quoted as criticizing Louis' management skills, these articles did not contain false information and did not otherwise indicate that Transamerica made false statements concerning Louis or Cambridge to *The Daily Record*.

On October 25, Transamerica instructed Signet Bank to dishonor twelve checks drawn on Cambridge accounts, and these checks were stamped "Returned to Maker." On November 7, *The Daily Record* published a third article concerning the termination of Cambridge's agency. Hayes was quoted in that article as stating that "[t]here has been no indication of any money missing or that anyone will lose any money" and further that Transamerica's investigation of Cambridge would continue for several months. The investigation undertaken by Transamerica eventually revealed that no actual shortfall existed in the escrow accounts.

The task of winding down Cambridge's business was the subject of frequent discussions between counsel for Cambridge and counsel for Transamerica. These discussions involved numerous disputed issues, consideration of which was complicated by the existing arrangements between the parties and by the disarray of Cambridge's books and records. On December 15, counsel for Cambridge wrote to counsel for Transamerica and demanded that Transamerica return $13,500 deposited in the so-called "release account." On January 19, 1990, counsel for Transamerica wrote to counsel for Cambridge and agreed to return to Cambridge $13,500 from the release account.

On May 1, 1990, plaintiffs Louis and Cambridge filed a complaint against defendant Transamerica in the Circuit Court for Baltimore City. On May 30, 1990, the case was removed to this Court because of the existence of diversity jurisdiction.

## II

## SUMMARY JUDGMENT PRINCIPLES

It is well settled that a defendant moving for summary judgment has the burden of

---

as an obstacle or impediment to this contemplated sale.

**6.** Plaintiffs have argued that Higgins understood that Transamerica would instruct Signet Bank to dishonor checks only if after reviewing the check

Transamerica believed that the signature on the check was fraudulent or that the dollar amount of the check had been altered. However, this contention is not borne out by Higgins' own deposition testimony.

showing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law. Rule 56(c), F.R.Civ.P.; *see also Barwick v. Celotex Corp.,* 736 F.2d 946, 958 (4th Cir.1984). This burden may be met by consideration of affidavits, exhibits, depositions and other discovery materials. *Id.*

One of the purposes of Rule 56 is to require a plaintiff, in advance of trial and after a motion for summary judgment has been filed and supported, to come forward with some minimal facts to show that a defendant may be liable under the claims alleged. *See* Rule 56(e). Moreover, " '[a] mere scintilla of evidence is not enough to create a fact issue; there must be evidence on which a jury might rely.' " *Barwick, supra,* 736 F.2d at 958–59 (quoting *Seago v. N. Carolina Theatres, Inc.,* 42 F.R.D. 627, 640 (E.D.N.C. 1966), *aff'd,* 388 F.2d 987 (4th Cir.1967)). In the absence of such a minimal showing, a defendant should not be required to undergo the considerable expense of preparing for and participating in a trial. As Judge Winter said in *Bland v. Norfolk & S.R.R. Co.,* 406 F.2d 863, 866 (4th Cir.1969):

> While a day in court may be a constitutional necessity when there are disputed questions of fact, the function of a motion for summary judgment is to smoke out if there is any case, *i.e.,* any genuine dispute as to any material fact, and, if there is no case, to conserve judicial time and energy by avoiding an unnecessary trial and by providing a speedy and efficient summary disposition.

In two cases decided in 1986, the Supreme Court clarified the principles applicable to a trial court's consideration of a summary judgment motion filed under Rule 56. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

In *Anderson,* the Supreme Court held that the standard for granting a summary judgment motion under Rule 56 is the same as that for granting a directed verdict under Rule 50, F.R.Civ.P. 477 U.S. at 250–51, 106 S.Ct. at 2511. The Court explained this standard as follows:

> [T]he judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. *The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient;* there must be evidence on which the jury could reasonably find for the plaintiff.

*Id.* at 252, 106 S.Ct. at 2512 (emphasis added).

In *Catrett,* the Court held that there is "no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim." 477 U.S. at 323, 106 S.Ct. at 2553 (emphasis in original). In reaching this result, the Court observed:

> Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed "to secure the just, speedy and inexpensive determination of every action." Fed.Rule.Civ.P. 1; see Schwarzer, Summary Judgment Under the Federal Rules: Defining Genuine Issues of Material Fact, 99 F.R.D. 465, 467 (1984).... Rule 56 must be construed with due regard not only for the rights of persons asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury, but also for the rights of persons opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis.

*Id.* at 327, 106 S.Ct. at 2555.

The Fourth Circuit discussed the Supreme Court's holdings in *Anderson* and *Celotex* in *Felty v. Graves–Humphreys Co.,* 818 F.2d 1126, 1128 (4th Cir.1987). Quoting *Celotex,* 477 U.S. at 323–24, 106 S.Ct. at 2553, Judge Wilkinson in *Felty* emphasized that trial judges have "an affirmative obligation ... to prevent 'factually unsupported claims and defenses' from proceeding to trial." *Id.* at 1128.

Applying these principles to the facts of record here, this Court has concluded that defendant's motions for summary judgment and for partial summary judgment must be granted.

## III

### THE CLAIMS

Plaintiffs' original and amended complaint contain a veritable laundry list of legal theories asserted under federal and state law whereby plaintiffs seek to recover substantial sums from defendant because of the termination of the business relationship between the parties. But more than an array of imaginative legal theories is needed to withstand the well-supported motions for summary judgment filed herein by defendant Transamerica. In spite of persistent attempts, plaintiffs have not been able to shoehorn material facts of record into any viable legal theory which would permit them to recover damages from defendant Transamerica.

During oral argument, counsel for plaintiffs conceded that an essential element of plaintiffs' case was their contention that representatives of Transamerica acted with actual malice. But no such proof has been presented. The termination of the business relationship between the parties was caused by plaintiffs' own deficient business practices. Defendant did not engage in tortious conduct or violate any statute when it exercised its contractual right to terminate the Agency Agreement. In spite of the voluminous discovery undertaken in the case, plaintiffs have not been able to point to material facts in the record which would defeat, as to any of the remaining counts of the amended complaint, defendant's motions for summary judgment.

Plaintiff's original complaint, filed in the Circuit Court for Baltimore City, contained six counts. Count I alleged a breach of contract, and Count II alleged that defendant had breached a number of implied covenants. In Count III, plaintiff asserted that defendant had negligently performed the June 1989 audit and negligently maintained Cambridge's business after it took control. Count IV asserted a cause of action for con-

version of plaintiff's property, and Counts V and VI charged that defendant interfered with economic relations between plaintiffs and its present and potential customers. Cambridge was the sole plaintiff in Counts I–IV and in Count VI while Louis was the sole plaintiff in Count V. Compensatory damages were sought in Counts I, II and III, and compensatory and punitive damages were sought in Counts IV, V and VI.

Following removal of the case to this Court, defendant Transamerica moved to dismiss Counts III, V and VI and also plaintiffs' claims for punitive damages asserted in Counts IV, V and VI. In its 18–page Memorandum and Order of August 15, 1990, this Court dismissed Counts III and V of the original complaint and also the claims for punitive damages asserted in Counts IV and VI. The parties then engaged in discovery pursuant to Scheduling Orders entered by the Court.

On January 7, 1991, plaintiff Cambridge filed a motion seeking leave of Court to file an amended complaint under Rule 15(a), F.R.Civ.P. Besides restating the surviving counts of the original complaint, the proposed amended complaint added nine counts. Counts IV and VI of the original complaint were reasserted as Counts III and IV of the amended complaint. In Counts V, VI and VII of the proposed amended complaint, plaintiff Cambridge sought a recovery on theories of defamation, false light invasion of privacy and injurious falsehood. Counts VIII–XIII of the proposed amended complaint alleged claims of plaintiff Louis. Count VIII alleged defamation; Count IX alleged false light invasion of privacy, and Count X alleged invasion of privacy by intrusion upon seclusion. Count XI sought a recovery under the Fair Credit Reporting Act (hereinafter "the FCRA"), 15 U.S.C. § 1681, *et seq.*, and Count XII alleged a similar violation of Md.Com.Law Code Ann. § 14–1201, *et seq.* Count XIII alleged interference with economic relations. Each of the nine counts added by the proposed amended complaint included a request for punitive damages.

Defendant Transamerica filed an opposition to plaintiff's motion for leave to file an amended complaint. After hearing oral ar-

gument, the Court, in a 27–page Memorandum and Order dated April 22, 1991, granted plaintiffs' motion for leave to file an amended complaint as to six of the nine counts which plaintiffs sought to add, namely Counts V, VII, VIII, IX, XI and XII. Plaintiffs' motion was denied as to three of the counts, namely Counts VI, X and XIII, and was also denied as to plaintiffs' claims for punitive damages asserted in Counts V and VII. In denying plaintiffs the right to assert those claims, the Court ruled that they could not withstand a motion to dismiss. In its Memorandum and Order of April 19, 1991, the Court said (slip op. at 2–3):

> Although plaintiffs appear to have unnecessarily proliferated their claims and although some of them are redundant and may be later subject to dismissal by way of a motion for summary judgment, the six

counts in question can at this stage of the case withstand a motion to dismiss.

On November 15, 1990, defendant had filed a motion for partial summary judgment, addressed to plaintiffs' so-called "obstacle" theory. Plaintiffs were permitted to complete their discovery before responding to that motion. Both defendant's earlier motion for partial summary judgment and its later motion for complete summary judgment are now ripe for decision. When the facts contained in this massive record are considered in the light of applicable summary judgment principles, this Court finds and concludes as a matter of law that plaintiffs are not entitled to a recovery from defendant Transamerica under any of the claims asserted.

The claims of the amended complaint that are now pending and the plaintiff asserting each claim are as follows:

Count I — breach of contract (Cambridge);
Count II — breach of implied covenants (Cambridge);
Count III — conversion (Cambridge);
Count IV — tortious interference with economic relations (Cambridge);
Count V — defamation (Cambridge);
Count VII — injurious falsehood (Cambridge);
Count VIII — defamation (Louis);
Count IX — false light invasion of privacy (Louis);
Count XI — violation of Fair Credit Reporting Act (Louis); and
Count XII — violation of Md.Com.Law Code Ann. § 14–1201 *et seq.* (Louis).

---

## IV

## DISCUSSION

### (a)

*Cambridge's Claims of Breach of Contract and Breach of Implied Covenants*

#### (Counts I and II)

In Counts I and II of the amended complaint, Cambridge asserts claims of breach of contract and breach of implied covenants. In support of its motion for summary judgment addressing these claims, defendant contends that its termination of the Agency Agreement was justified by numerous material breaches by Cambridge and that Cambridge therefore cannot proceed to trial on its claims of breach of contract and breach of implied covenants. By way of

response, Cambridge argues that disputed issues of fact exist concerning the materiality of its alleged breaches and concerning defendant's good faith in terminating the agency.

It is well established under Maryland law that a breach of contract is a failure, without legal excuse, to perform any promise which forms the whole or part of a contract. *See Weiss v. Sheet Metal Fabricators, Inc.,* 206 Md. 195, 203, 110 A.2d 671 (1955). "If a court properly determines that the contract is unambiguous on a dispositive issue, it may then properly interpret the contract as a matter of law and grant summary judgment because no interpretive facts are in genuine issue." *World–Wide Rights Ltd. Partnership v. Combe Inc.,* 955 F.2d 242, 245 (4th Cir.1992); *see also Speed v. Bailey,* 153 Md. 655, 662, 139 A. 534 (1927).

Applying these principles to the facts of record here, this Court concludes that Cambridge has failed to demonstrate that disputed issues of material fact exist concerning its claims of breach of contract and breach of implied covenants. The record establishes as a matter of law that the escrow accounts of plaintiff Cambridge were in disarray and that Cambridge failed to properly report policies and remit premiums to defendant. Before terminating the Agency Agreement, defendant repeatedly notified Cambridge of its concerns, but Cambridge was unable or unwilling to remedy the blatant managerial deficiencies which existed. These failures of Cambridge clearly constituted material breaches of the Agency Agreement entitling Transamerica to terminate the relationship when it did.

According to Joel Parker, an experienced executive in the title insurance industry, Cambridge's escrow accounting controls failed to comply with accepted industry standards. Parker's negative assessment of Cambridge's accounting practices is confirmed by Cambridge's own bookkeeper, Linda DiCarlo. DiCarlo was employed by Cambridge from 1987 through 1989 as the Company's bookkeeper. She became the Company's full-time bookkeeper in February 1989 and was asked by plaintiff Louis to work full time to review and reconcile Cambridge's escrow accounts.[7] In her affidavit, DiCarlo stated that Cambridge's records were in poor condition, that Louis was not interested in correcting this problem, and that such correction would have involved a considerable investment of time and resources. According to DiCarlo, blank checks from the various escrow accounts were kept in unlocked file cabinets; settlement officers took blank checks to settlements; deposits were made into the incorrect escrow account, and disbursements were made to third parties by checks drawn on the wrong escrow account. Transaction ledger cards were not organized and were either missing or filled out in an incomplete fashion. In September and October of 1989, one or more of the escrow accounts were subject to a number of over-

drafts, a problem which regularly occurred during 1989. As of October 1989, the escrow accounts of Cambridge had not been fully or properly reconciled, and substantial progress had not been made in implementing any escrow controls.

Louis himself essentially conceded that Cambridge had breached its contract with Transamerica. In his letter of September 19, Louis expressly acknowledged the presence of serious managerial problems, and stated his belief "if all items are not truly satisfactory to Transamerica, that our agency contract will be terminated." He stated that he would begin negotiations with other underwriters "in order to protect Cambridge Title in the event of your displeasure with my answers." In his deposition testimony, he admitted that no substantial progress was ever made toward remedying the problems noted by Transamerica. Louis also conceded in his deposition that he himself had no personal knowledge of the condition of the escrow accounts. In view of these significant facts, this Court has determined that there is no genuine dispute that Cambridge's numerous material breaches of the Agency Agreement justified defendant's termination of the agency relationship.

■ During oral argument and in post-argument submissions, counsel for plaintiffs contended that DiCarlo's affidavit should not be considered by the Court because it was attached as an exhibit to defendant's reply memorandum. This contention will be rejected. Plaintiffs were previously given notice by defendant that defendant might be calling as witnesses "all employees of plaintiff Cambridge." Certainly, DiCarlo, the bookkeeper, was a key employee who could have been deposed by counsel for plaintiff during the discovery period. Counsel for plaintiffs have argued that plaintiffs had no opportunity prior to the hearing to set forth reasons why the Court should give no consideration to DiCarlo's affidavit. However, the hearing on these motions was held on January 24, 1992, and defendant's reply memo-

---

7. In his letter of September 19 to Wilson, Louis acknowledged that "new and additional controls must be placed on our escrow accounts," and stated that DiCarlo would be in charge of developing new procedures.

randum and supporting papers had been filed eleven days earlier, on January 13, 1992. At no time during the intervening period did plaintiffs request that they be permitted to respond to defendant's reply memorandum because of surprise, or that they be permitted to take the deposition of DiCarlo before the hearing, or that the hearing be continued.[8]

■ Similarly, this Court is satisfied that plaintiff Cambridge does not have a viable claim of breach of implied covenants. As defendant points out, introduction of an implied term into a contract can be justified only when it does not contradict the contract's express terms. *See* 11 *Williston on Contracts,* § 1295 at 34–36 (1968). Since the express terms of the Agency Agreement clearly permitted defendant to terminate the agency for the reasons that it did, plaintiff Cambridge cannot rely on the argument that Transamerica's act of termination breached an implied covenant in the Agreement of good faith and fair dealing. In any event, plaintiff Cambridge has failed to adduce evidence to show that defendant breached any duties of good faith and fair dealing by terminating the Agency Agreement. For these reasons, defendant is entitled to the entry of summary judgment as to Counts I and II.

(b) .

*Cambridge's Claim of Conversion*

(Count III)

■ In Count III of the complaint, Cambridge advances a claim of conversion, based on the lien on property of Cambridge asserted by Transamerica pursuant to provisions of the Agreement. In support of its motion for summary judgment, defendant contends, *inter alia,* (1) that the express terms of the Agency Agreement permitted it to assert a lien on the assets of Cambridge if Cambridge was in material breach, and (2) that Cambridge later consented to defendant's exer-

cise of dominion over Cambridge's property. By way of response, plaintiff Cambridge does little more than reiterate its argument that it did not materially breach the Agency Agreement. It is also argued that defendant is liable for so-called "constructive conversion" because defendant refused to return Cambridge's property after it had been finally determined that no shortfall existed in the escrow accounts.

On the record here, this Court finds and concludes that plaintiff Cambridge's claim of conversion is without merit. Clearly, plaintiff cannot rely on a theory of "direct conversion" because provisions of the Agency Agreement and the Escrow Agreement permitted defendant to exercise the self-help remedies which were undertaken in October of 1989. Moreover, Cambridge, with the advice of counsel, later consented to the exercise of these remedies by defendant.

■ Likewise, Cambridge has not pointed to facts in the record which would support a claim of indirect conversion. *See K & K Management, Inc. v. Lee,* 316 Md. 137, 173–74, 557 A.2d 965 (1989). The Agreement was terminated because of accounting and bookkeeping deficiencies. Once terminated, Transamerica was entitled to assert a lien on Cambridge's property. Any delay in the return of plaintiff's property was manifestly caused by the difficulties faced by defendant in attempting to bring order to Cambridge's books and records. Accordingly, defendant's motion for summary judgment will also be granted as to Count III.

(c)

*Cambridge's Claim of Tortious Interference with Economic Relations*

(Count IV)

■ Count IV of the amended complaint asserts on behalf of Cambridge a claim of tortious interference with economic relations. Specifically, it is alleged that defendant inter-

8. In a post-argument submission to the Court, counsel for plaintiffs has argued that DiCarlo should not be believed because after the Agency Agreement was terminated, she was hired by Transamerica and because she purportedly had lied to an officer of Transamerica. However, questions of credibility are inappropriate for consideration by the Court when ruling on a motion for summary judgment. On the record here, the Court has not concluded that statements of DiCarlo, who was Cambridge's own bookkeeper at the critical times, should not be considered by the Court in ruling on the pending motions.

fered with Cambridge's business relations with existing and prospective customers, with a joint venture and with Commonwealth.

In support of its motion for summary judgment, defendant contends, *inter alia,* that no facts of record indicate that it acted with an improper purpose in asserting a lien on the assets of Cambridge. By way of opposition, plaintiff Cambridge argues, *inter alia,* that the record discloses that defendant asserted a lien on Cambridge's assets to gain the benefit of selling those assets to Commonwealth.

■ Under Maryland law, the elements of a claim of tortious interference with economic relations are: (1) intentional and willful acts; (2) calculated to cause damage to the plaintiff in his lawful business; (3) done with the unlawful purpose to cause such damage and loss, without right or justifiable cause; and (4) actual damage and loss resulting. *Natural Design, Inc. v. Rouse Co.,* 302 Md. 47, 71, 485 A.2d 663 (1984). To demonstrate an unlawful purpose under Maryland law, a plaintiff must show that the defendant's conduct was "directed at" an existing or prospective economic relationship between the plaintiff and a third party. *K & K Management,* 316 Md. at 159, 557 A.2d 965. The interference cannot be a mere "incidental effect" of the allegedly wrongful conduct of the defendant. *Id.* at 162, 557 A.2d 965.

Applying these principles to the facts of record here, this Court concludes that facts do not exist to support Cambridge's claim of tortious interference with its economic relations. As discussed hereinabove, it is clear from the record here that defendant was entitled under the Agency Agreement to avail itself of the self-help remedies which it exercised in October of 1989. There was no ulterior motive. Transamerica acted as it did pursuant to rights conferred on it by the Agency Agreement and not for the purpose of disrupting negotiations between Cambridge and Commonwealth. Although Hayes' assertion in the presence of Selby that Louis or Cambridge owed him $1.5 million later proved to be erroneous when accounting records were finally put in proper shape, the statement was justifiable in view of Transamerica's good-faith efforts to recon-

cile the escrow accounts. These efforts were hampered by the total disarray found to exist in these accounts which had clearly been caused by plaintiffs' managerial deficiencies.

■ On the record here, this Court concludes that defendant was justified in providing information to Commonwealth which may have adversely affected the proposed sale of Cambridge's assets to Commonwealth. *See Natural Design, Inc.,* 302 Md. at 71, 485 A.2d 663. Any interference with this transaction was merely an incidental effect of acts of Transamerica. For these reasons, defendant's motion for summary judgment will be granted as to Count IV.

### (d)
### *Cambridge's Claim of Defamation*
### (Count V)

■ In Count V of the amended complaint, plaintiff Cambridge alleges a claim of defamation based on defendant's alleged statements and publications: (1) to Selby; (2) to Signet Bank; (3) to payees of twelve dishonored checks; and (4) to *The Daily Record.* In support of its motion for summary judgment, defendant contends, *inter alia,* that Hayes' statement concerning the indebtedness of Louis or Cambridge to Transamerica was privileged (1) because Louis consented to this statement when he himself previously informed Selby of the purported shortfall and (2) because Hayes was seeking in good faith to protect Transamerica's property interests. Defendant also asserts that the other allegedly defamatory statements and publications at issue were not false. By way of response, Cambridge argues, *inter alia:* (1) that Louis did not consent to the statement of Hayes; (2) that defendant abused any conditional privilege to which it may otherwise have been entitled; and (3) that the other statements and conduct alleged were false and defamatory.

On the record here, this Court has concluded that plaintiff Cambridge cannot proceed to trial in this case on its claim of defamation. Hayes' statement to Louis in the presence of Selby was clearly privileged. Louis consented to the publication in question because he had himself previously told

Selby that Transamerica believed that a significant shortfall existed in the escrow accounts. *See Exxon Corp. USA v. Schoene,* 67 Md.App. 412, 420, 508 A.2d 142 (1986).

Moreover, Hayes' statement was made to protect Transamerica's lien on the assets of Cambridge, an interest of some importance to Transamerica. *See* Restatement (Second) of Torts § 594. Plaintiff Cambridge argues that the statement was made with a reckless disregard for its truth or falsity and that defendant thereby abused any conditional privilege it possessed to provide information affecting a legally-protected property interest. This contention is without merit. Any uncertainty as to the actual existence of the shortfall was plainly caused by the poor state of Cambridge's books and records. Hayes was therefore justified in relying on information gleaned from Transamerica's preliminary review of those books and records.

■ Insofar as defendant's publications to Signet Bank, to the payees of the twelve checks and to *The Daily Record* are concerned, plaintiff Cambridge has failed to establish falsity, a necessary element of a claim of defamation. For these reasons, defendant's motion for summary judgment will be granted as to Cambridge's claim of defamation contained in Count V.

### (e)
### *Cambridge's Claim of Injurious Falsehood*
### (Count VII)

■ Count VII of the amended complaint alleges on behalf of Cambridge a claim of injurious falsehood. In support of its motion for summary judgment, defendant contends, *inter alia,* that its statements were protected by the conditional privilege available to persons who in good faith assert their own legally-protected interest in the property of another. By way of response, Cambridge contends, *inter alia,* that defendant abused any applicable privilege to which it was entitled.

In *Dixon v. Process Corp.,* 46 Md.App. 198, 204, 416 A.2d 1295 (1980), the Court of Special Appeals adopted and applied § 647 of the Restatement (Second) of Torts, which provides that one defending a claim of injurious falsehood may rely on a conditional privilege to make statements in the furtherance of one's own self-interest. The court in *Dixon* quoted and relied on Comment d to § 647, which states in pertinent part that:

> [i]t is not necessary that the person asserting the claim [of a legally-protected interest] should believe in its certain or even probable validity. It is enough if he believes in good faith that there is a substantial chance of its being sustained. Bad faith is treated as an abuse of the privilege . . .

46 Md.App. at 205, 416 A.2d 1295.

Applying these principles here, this Court concludes that Cambridge has failed to adduce facts which would support its claim of injurious falsehood. The only allegedly injurious conduct of defendant which occurred while plaintiff Cambridge was a going concern was Hayes' October 18 statement to Louis. The conditional privilege recognized by the Court of Appeals in *Dixon* clearly applies to this statement, inasmuch as Hayes was acting in good faith when he asserted on behalf of defendant a legally-protected interest in the assets of Cambridge. Cambridge has failed to point to facts in the record indicating that Hayes did not himself subjectively believe on October 18 that Cambridge probably owed Transamerica $1.5 million.

Accordingly, Cambridge's claim of injurious falsehood is barred by the conditional privilege available to persons who in good faith make a statement in furtherance of their own self-interest in protecting their property. For this reason, defendant's motion for summary judgment will also be granted as to Count VII.

### (f)
### *Louis' Claim of Defamation*
### (Count VIII)

■ In Count VIII, plaintiff Louis asserts a claim of defamation based upon the same statements and publications relied upon by plaintiff Cambridge in Count V. As discussed hereinabove, Hayes' statement concerning Louis' purported indebtedness to defendant was privileged, and the other statements and publications alleged were not false and defamatory. For like reasons, defendant

is also entitled to summary judgment as to Count VIII.

(g)

*Louis' Claim of False Light Invasion of Privacy*

(Count IX)

 Count IX alleges on behalf of plaintiff Louis a claim of false light invasion of privacy. In addressing this claim in their arguments, the parties essentially reiterate their contentions concerning Louis' claim of defamation, and in addition dispute whether defendant's alleged conduct exposed Louis personally to publicity.

 The elements of a claim of false light invasion of privacy are: (1) publicity in a false light before the public; (2) which a reasonable person would find highly offensive; and (3) that the actor had knowledge of or acted in reckless disregard of the publicized matter placing plaintiff in a false light. Restatement (Second) of Torts § 652E; *Hollander v. Lubow,* 277 Md. 47, 55, 351 A.2d 421 (1976). For the purposes of the claim asserted by plaintiff in this case, "publicity" would consist of a communication "to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge." Restatement (Second) of Torts § 652D, comment a; *see also Moore v. Big Picture Co.,* 828 F.2d 270, 273 (5th Cir.1987).

Applying these principles here, this Court concludes that plaintiff Louis cannot in this case proceed to trial on a claim of false light invasion of privacy. No conduct of defendant placed Louis in a false light before the public. The only publications which might arguably satisfy the required element of publicity before the public were the statements to *The Daily Record.* As discussed herein, these statements were not false. Accordingly, summary judgment will be entered in favor of defendant as to Count IX.

(h)

*The Statutory Claims of Plaintiff Louis*

(Counts XI and XII)

 In Counts XI and XII, plaintiff Louis alleges that defendant's procurement of credit reports concerning him violated the FCRA, 15 U.S.C. § 1681 *et seq.,* and its virtually identical state analogue, Md.Com. Law Code Ann. § 14–1201, *et seq.* In support of its motion for summary judgment, defendant asserts, *inter alia,* that it had a legitimate need for these credit reports in connection with a business transaction involving Louis. By way of response, Louis contends, *inter alia,* that no such legitimate business need existed because defendant procured the October 9, 1989 credit report on Louis in order to determine whether he was guilty of wrongdoing.

The FCRA and its Maryland analogue permit a "consumer reporting agency" to furnish a "consumer report" only in certain circumstances, including instances wherein the user of the report "has a legitimate business need for the information in connection with a business transaction involving the consumer." 15 U.S.C. § 1681b(3)(E); Md.Com.Law Code Ann. § 14–1202(3)(v).

Applying these statutory requirements to the facts of record here, this Court concludes as a matter of law that defendant had a legitimate business need for the credit reports in question in connection with its business relationship with Louis. The March 1989 credit report was obtained pursuant to regular credit checks undertaken by Transamerica concerning a person like Louis who was the principal of one of Transamerica's agents. Transamerica plainly had a legitimate need to examine the financial condition of a principal of an agent with whom it did substantial business.

 Transamerica also had a legitimate business need to procure the October 9, 1989 credit report. Defendant obtained this report on Louis to determine if he had misappropriated the $1.3 million believed to be missing from the escrow accounts. On the record here, there can be no doubt that defendant had a dire and legitimate need for obtaining the October 9 credit report. The mismanagement of Cambridge had resulted in an apparent $1.3 million shortfall in its escrow accounts, and defendant justifiably sought to determine whether these funds had been converted to Louis' personal use.

A review of the cases cited by Louis confirms this Court's determination that the October 9 credit report was obtained for a permissible purpose under both the FCRA and the Maryland statute. The decision in *Heath v. Credit Bureau of Sheridan, Inc.,* 618 F.2d 693 (10th Cir.1980) is distinguishable since no business relationship existed in the case between plaintiff, a union member, and defendant union. Likewise, the courts in both *Russell v. Shelter Financial Services,* 604 F.Supp. 201, 202 (W.D.Mo.1984) and *Boothe v. TRW Credit Data,* 557 F.Supp. 66, 70 (S.D.N.Y.1981) were careful to point out that the parties in those cases were not engaged in "a business arrangement" or "business dealings" when the credit reports at issue were obtained by the defendants. By way of contrast, defendant in this case was involved in an existing business relationship with Cambridge and Louis when it procured the October 9 credit report. Transamerica ordered the report for the express reason of determining whether Louis was abusing for his own personal gain the business relationship between Cambridge and Transamerica.

For these reasons, defendant is entitled to summary judgment as to Counts XI and XII.

(i)

*Plaintiffs' "Obstacle" Theory*

 Defendant's motion for partial summary judgment is addressed to the so-called "obstacle" theory relied upon by plaintiffs in this case. In support of many of the claims asserted by them in this case, plaintiffs have contended that defendant was motivated by its perception of Cambridge as an obstacle or impediment to the contemplated sale of Transamerica to Reliance, the parent of Commonwealth.

On the record here, this Court has concluded that facts do not exist which would lead a rational trier of fact to credit plaintiffs' "obstacle" theory. Plaintiffs' argument amounts to little more than a speculative inference based on facts occurring after the Agency Agreement was terminated, namely that Reliance acquired Transamerica in the Spring of 1990 and that certain management personnel have served both companies. However, the critical events in this case occurred in the Fall of 1989. Defendant was not then motivated by any belief during that period that Cambridge was an obstacle to the transaction later concluded with Reliance. As discussed herein, Transamerica acted as it did in the Fall of 1989 in order to protect its business interests.

Accordingly, defendant's motion for partial summary judgment must also be granted.

V

CONCLUSION

For all the reasons set forth herein, this Court will grant both the motion for partial summary judgment and the motion for summary judgment of defendant Transamerica Title Insurance Company. An appropriate Order will be entered by the Court.